**CIBA–GEIGY CORPORATION, Plaintiff,**

v.

**SANDOZ LTD., et al., Defendants.**

**Civil Action No. 92–4491 (MLP).**

United States District Court,
D. New Jersey.

Dec. 29, 1995.

Lawrence M. Rolnick, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Plaintiff, Ciba–Geigy Corp.

Joel Schneider, Manta & Welge, Princeton, NJ, for Defendant, Sandoz Ltd., et al.

## MEMORANDUM

WOLFSON, United States Magistrate Judge.

Presently before the Court is the motion by defendants Sandoz Ltd., Sandoz Corporation, Sandoz Pharmaceuticals Corporation, and Sandoz Chemicals ("Sandoz"), seeking a Protective Order compelling plaintiff to return copies of a privileged document which defendants maintain they inadvertently disclosed. The Court has received moving, opposition, reply and sur-reply briefs. This matter is being considered pursuant to *Fed. R.Civ.P.* 78. For the following reasons, the Court will deny defendants' motion on the grounds that defendants have failed to establish that they inadvertently produced copies of the document. Accordingly, the Court rules that defendants waived the attorney-client privilege with respect to the document.

*Procedural History*

On October 23, 1992, plaintiff filed the complaint in this action against the Sandoz defendants. Plaintiff's complaint seeks relief under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Action of 1986 (42 U.S.C. §§ 9601–75), the New Jersey Spill Compensation and Control Act (N.J.Stat. Ann. § 58:10–23.11 through 58:10–23.11z), the New Jersey Joint Tortfeasors Contribution Law (N.J.Stat.Ann. § 2A:53A–1, *et seq.*), and other common law principles, for costs incurred or to be incurred by plaintiff in cleaning up hazardous waste at its Toms River, New Jersey plant, formerly the Toms River Chemical Company ("TRC").[1] *Plaintiff's Complaint* at ¶ 1. Plaintiff alleges that, until November, 1981, plaintiff and defendants operated the TRC as a joint venture, and that, during this period, the TRC's waste disposal and/or waste treatment practices resulted in the contamination of the plant. *Plaintiff's Complaint* at ¶ 2. The United States subsequently demanded that plaintiff clean-up the plant. *Plaintiff's Complaint* at ¶ 2. Plaintiff avers that, because defendants failed to contribute to any of the clean-up costs, plaintiff has borne the full financial burden of the clean-up, which, at the time of the filing of the complaint, exceeded $55 million. *Plaintiff's Complaint* at ¶ 7.

On December 16, 1994, plaintiff filed a second amended complaint, which added a count alleging that plaintiff and defendants had participated in a joint venture, and that, as a joint venturers, defendants were liable to plaintiff for some or all of the response costs incurred in connection with the clean-up. *See Plaintiff's Second Amended Complaint* at ¶¶ 73–79.

On August 31, 1995, defendants moved to dismiss the joint venture count added by the second amended complaint on the grounds that the alleged joint venture agreement failed to satisfy the statute of frauds and that the joint venture agreement had been integrated into other contracts. *See Defendants'*

---

1. Plaintiff further seeks costs incurred or to be incurred for the clean-up of other "off-site" facilities at which the TRC arranged to have portions of its waste disposed or treated. *Plaintiff's Complaint* at ¶ 1.

*Memorandum Of Law In Support Of Their Motion To Dismiss Count Three of Plaintiff's Second Amended Complaint* at 21–26.

### The Protective Order

On April 5, 1994, this Court made several rulings regarding the provisions to be contained in the parties' proposed Protective Order. With respect to the inclusion of an inadvertent disclosure provision, the Court rejected the so-called "blanket" inadvertent disclosure clause advocated by plaintiff's counsel, and insisted that any such provision would not excuse the parties from conducting a privilege review prior to the production of documents, in accordance with controlling case law. *See Minutes of Proceedings Dated April 5, 1994,* at 28.

On June 23, 1994, a Protective Order was entered in this case. Paragraph 19 of the Protective Order provides that an inadvertent disclosure of a privileged document will not waive any claim of privilege with respect to the inadvertently-produced document.[2] Paragraph 14 provides that a party shall make available, forty-five days in advance of a deposition, documents it intends to use as exhibits.[3]

### Factual Background

The document at issue is an internal Sandoz Ltd. memorandum, dated May 15, 1973, and written in German. *Defendants' October 20, 1995 Brief,* Exhibit 3, Second Supplemental Affidavit of Matthew D. Lee, Esq., at ¶ 3 (hereinafter "2d Lee Supp. Aff.") and Exhibit 4, Affidavit of Thomas A. DiBiase, Esq., at ¶ 3 (hereinafter "DiBiase Aff."); *Defendants' October 6, 1995 Brief,* Exhibit 1, Supplemental Affidavit of Matthew D. Lee, Esq., at ¶ 3 (hereinafter "Lee Supp.Aff.") and Exhibit 2, Affidavit of Matthew D. Lee, Esq., at ¶ 3 (hereinafter "Lee Aff."). The document, authored by Dr. Ulrich Oppikofer, a Sandoz Ltd. attorney, and addressed to Max Hediger, an employee of Sandoz Ltd., conveys legal advice regarding the Toms River Chemical Corporation (hereinafter the "Oppikofer document"). *DiBiase Aff.* at ¶ 3; *Lee Supp.Aff.* at ¶ 3; *Lee Aff.* at ¶ 3. Counsel, without conducting any privilege review, produced copies of the Oppikofer document on two separate occasions. The first disclosure occurred on August 31, 1995, when defendants produced two copies of the original German document in connection with their designation of potential exhibits for the depositions of two witnesses, Mr. Max Hediger, the addressee of the Oppikofer document, and Dr. Jakob Benz.[4] *Lee Aff.* at ¶ 6. The second occurred on August 29, 1995, when defendants produced two copies of each of two different English translations of the document.[5] *Lee Supp.Aff.* at ¶ 7; *Lee Aff.* at ¶ 8.

On July 13, 1995, defense counsel noticed the depositions of Hediger and Benz, and scheduled them to take place the week of September 11, 1995. *Lee Supp.Aff.* at ¶ 4; *Lee Aff.* at ¶ 6. On July 31, 1995, counsel

---

2. Paragraph 19 provides, in pertinent part, that: The inadvertent production during discovery pursuant to this Stipulation of any document or other information subject to the attorney-client privilege, work-product immunity, or other privilege shall be without prejudice to any claim that such material is privileged or protected from discovery and no party will be held to have waived any rights by such inadvertent production; provided, however, that the producing party shall give notice to the other party (within thirty days after learning of such production) that it is asserting a claim of privilege or other objection with respect to such document or other information.... Upon a claim of inadvertent production, the parties shall determine whether there is agreement as to the producing party's claim of privilege or other objection. If agreement cannot be reached, the burden shall be on the producing party to obtain a hearing before the court and to establish its claim of privilege.

3. Paragraph 14 provides, in pertinent part, that:

> Each party shall provide at least sixty (60) days' notice prior to the taking of a deposition, unless otherwise agreed by counsel. The party noticing the deposition shall make available to the other parties forty-five (45) days in advance of the deposition all documents it intends to use as exhibits in the deposition or about which it intends to question such witness ("Proposed Deposition Exhibits").

4. Plaintiff asserts that, on July 31, 1995, it received two copies of the Oppikofer document in connection with the deposition of Mr. Hediger only. *Plaintiff's October 6, 1995 Brief* at 7, 26.

5. *See Plaintiff's October 6, 1995 Brief* at 13, 26. Thus, defendants produced a total of 6 copies of the Oppikofer document. *Id.*

designated 681[6] documents as exhibits for the depositions, without reviewing any of the documents for privilege. *2d Lee Supp.Aff.* at ¶ 6; *Lee Supp.Aff.* at ¶ 4; *Lee Aff.* at ¶ 6. Mr. Matthew D. Lee, Esq., counsel for defendant, was responsible for the designation of the documents. *2d Lee Supp.Aff.* at ¶ 6. Of the 681 documents designated as exhibits, 300 were in English, and 381 were in German. *Lee Supp.Aff.* at ¶ 4; *Lee Aff.* at ¶ 6. Included among the German documents were two copies of the Oppikofer document. *Lee Aff.* at ¶ 6.

Counsel had selected the deposition documents by conducting a search for all documents bearing the name of either Mr. Hediger or Mr. Benz on the litigation database of Shearman & Sterling, *pro hac vice* counsel for defendants. *Lee Supp.Aff.* at ¶ 4; *Lee Aff.* at ¶ 6. Defense counsel claims that its failure to review any of the documents for privilege prior to designating them as exhibits was the result of their mistaken belief that all documents on Shearman & Sterling's database had previously been produced to plaintiff, and thus, that none of the documents contained on the database was privileged. *Lee Supp.Aff.* at ¶ 5; *Lee Aff.* at ¶ 7. This mistaken belief was based upon conversations with Thomas A. DiBiase, Esq., a former associate at Shearman & Sterling, and other associates who were familiar with the firm's database and who had been involved with defendants' prior document productions to plaintiff. *DiBiase Aff.* at ¶ 1, ¶ 4; *2d Lee Supp.Aff.* at ¶ 6.

Sometime after July 31, 1995, Mr. Lee discovered in a file folder two English translations of the Oppikofer document, one dated August 29, 1991, and the other dated December 8, 1994, which translations had been performed in-house at Shearman & Sterling. *2d Lee Supp.Aff.* at ¶¶ 6, 11. *Lee Supp.Aff.* at ¶ 7. On August 23, 1995, Mr. Lee confirmed with Thomas A. DiBiase his understanding that the documents on Shearman and Sterling's database had been previously produced

to plaintiff. *2d Lee Supp.Aff.* at ¶ 8; *Lee Supp.Aff.* at ¶ 9; *Lee Aff.* at ¶ 7.

On August 29, 1995, pursuant to an agreement with plaintiff's counsel, defense counsel produced English translations of the 381 German documents designated as exhibits. *Lee Supp.Aff.* at ¶ 7; *Lee Aff.* at ¶ 8. Prior to producing the translations, counsel "briefly" reviewed the documents for substance, but again failed to review them for privilege. *See Lee Supp.Aff.* at ¶ 8. In reliance upon its prior beliefs and upon Mr. DiBiase's statements of August 23, 1995, counsel continued to labor under the misapprehension that the documents had been previously produced to plaintiff. *2d Lee Supp.Aff.* at ¶ 10; *Lee Supp.Aff.* at ¶ 8; *Lee Aff.* at ¶ 8. Included among the translations were two copies of each of the two translations of the Oppikofer document discovered by Mr. Lee. *Lee Supp. Aff.* at ¶ 7; *Lee Aff.* at ¶ 8; *Plaintiff's October 6, 1995 Brief* at 13.

On September 5, 1995, plaintiff's counsel wrote a letter to Judge Mary Little Parell, stating that he wished to "bring to the Court's attention 'newly discovered evidence,'" evidence which plaintiff's counsel believed was dispositive of the claims asserted in defendants' motion to dismiss the joint venture claim added by plaintiff's second amended complaint. *Plaintiff's September 5, 1995 Letter* at 1. The "newly discovered" evidence was the Oppikofer document. In a letter dated September 8, 1995, defendants responded that they had inadvertently produced the document, and that, pursuant to paragraph 19 of the Protective Order, defendants invoked the attorney-client privilege with respect to the document. *See Defendants' September 8, 1995 Letter* at 1. Following plaintiff's reply, Judge Parell referred this matter to this Court for resolution.

As a result of plaintiff's September 5 letter to Judge Parell, defense counsel conducted an investigation of this matter, and discovered that, in September, 1992, the Oppikofer document had been withheld on the grounds of attorney-client privilege in connection with

---

**6.** Plaintiff asserts that on July 31, 1995, defense counsel sent it 205 documents in connection with the deposition of Mr. Hediger, which documents included two copies of the Oppikofer document. *Plaintiff's October 6, 1995 Brief* at 7. Plaintiff asserts that out of the 205 documents, 171 were in German. *Id.* at 8. The Court, however, will credit defendant's assertion that there was a total of 681 documents designated for the depositions of both Mr. Hediger and Mr. Benz.

the deposition of Dr. William Luthy, a deposition for which defendants produced 7,000 documents and for which no privilege log was produced. *Lee Aff.* at ¶¶ 13, 14; *DiBiase Aff.* at ¶¶ 5–7. Counsel also learned that the Oppikofer document had been withheld from disclosure in all subsequent productions to plaintiff, with the exception of the production in issue. *Defendants' October 6, 1995 Brief* at 6; *DiBiase Aff.* at ¶ 8. In addition, all productions, other than the one at issue, had been preceded by a thorough privilege review. *DiBiase Aff.* at ¶ 8.

Counsel also reviewed for privilege all other documents it had produced to plaintiff in connection with the Hediger and Benz depositions, and realized that they had, in addition to the Oppikofer document, turned over twenty-three pages of other privileged documents. *Lee Supp.Aff.* at ¶ 12; *Defendants' October 6, 1995 Brief* at 4 n. 2. On September 18, 1995, counsel learned that Shearman & Sterling's database indeed contained documents which defendants had previously withheld from production on the grounds of privilege, and thus, that its belief to the contrary had been erroneous. *2d Lee Supp.Aff.* at ¶ 8; *Lee Aff.* at ¶ 13.

### The Parties' Contentions

Because counsel submitted their initial briefs simultaneously, rather than in response to one another, and then submitted replies and sur-replies, the Court will summarize the arguments made in each of the parties initial briefs, followed by the arguments in response.

#### 1. Defendant's October 6, 1995 Brief

In its October 6, 1995 brief, defendants argue that the case law governing the issue of inadvertent disclosure is inapplicable to this case, and instead point to Paragraph 19 of the Protective Order as controlling. *Defendants' October 6, 1995 Brief* at 7. Defendants claim that they "inadvertently," *i.e.* unintentionally and unknowingly, produced the Oppikofer document, which they assert is indisputably protected by the attorney-client privilege,[7] and that paragraph 19 of the Protective Order immunizes such inadvertent

disclosures from any claim of waiver. *Id.* at 5–6.

Defendants alternatively claim that they took reasonable precautions to protect the Oppikofer document from inadvertent disclosure. *Id.* Defendants note that they have produced more than 44,000 pages of documents over the course of the past four years, and that, prior to each production, they carefully reviewed each document for privilege, with the exception of this one noteworthy instance. *Id.* Defendants further maintain that the protracted nature of this litigation, combined with the numerous attorneys who were involved with defendant's document productions to plaintiff, were the primary causes of the Oppikofer document's inadvertent disclosure. *Id.* at 8. Defendants stress that none of the attorneys responsible for defendants' previous document productions is now employed at Shearman & Sterling. As a result, defendants maintain, they reasonably relied upon the statements of former Shearman & Sterling associate Thomas DiBiase that all of the documents on Shearman & Sterling's litigation database had been previously produced, and thus previously reviewed and determined to be non-privileged. *Id.*

Defendants further contend that their failure to review the Oppikofer document for privilege is understandable in light of the deadlines imposed by the Protective Order for the designation of documents for depositions. *Id.* at 9. Defendants observe that they had only two weeks within which to review all of the documents designated for the Benz and Hediger depositions, and that the large number of German documents involved exacerbated their task. *Id.* Hence, based upon the arguments outlined above, defendants urge this Court to rule that their disclosure of the Oppikofer document did not waive the attorney-client privilege with respect to the document.

In reply, plaintiff argues that defendants' argument, based on the language of the Protective Order, is flawed for several fundamental reasons. *Plaintiff's October 19, 1995 Brief* at 1. First, plaintiff points out, the Protective Order preserves each party's right

---

**7.** *See Defendant's October 6, 1995 Brief* at 1 n. 1.

to assert a claim for privilege, but does not preserve the privilege regardless of the circumstances surrounding the production. *Id.* Second, plaintiff contends, defendants attempt to eviscerate the meaning of "inadvertent" by arguing that its sole meaning within the context of this case is "unintentional." *Id.* Third, plaintiff notes that defendants' interpretation of the Protective Order is at odds with this Court's instructions during the April 5, 1994 hearing that a privilege review must precede any document production in this case. *Id.* at 3.

In addition, plaintiff asserts that "associate turnover" did not excuse defendants from failing to review the documents for privilege. *Id.* at 5. Instead, plaintiff maintains that the turnover imposed a burden upon newly-assigned defense counsel to "de-brief" departing attorneys regarding prior procedures implemented to protect privileged documents. *Id.*

### 2. Plaintiff's October 6, 1995 Brief

Plaintiff contends that defendants failed to establish that the disclosure of the Oppikofer document was inadvertent, in accordance with controlling case law, because there is no evidence that defendants implemented adequate procedures to protect the confidentiality of the Oppikofer document.[8] *Plaintiff's October 6, 1995 Brief* at 13. In support of its contention, plaintiff, among other things, maintains that defendants improperly commingled privileged and non-privileged documents on their litigation database and that defendants twice failed to review for privilege the documents produced in connection with the Hediger and Benz depositions. *Id.* 20–21.

In addition, plaintiff contends that defendants' arguments predicated on the size of

the privilege review involved, as well as the time constraints imposed for producing designated documents, are unavailing. *Id.* at 21–22. Plaintiff maintains that there were only a limited number of documents relevant to the Hediger and Benz depositions, and that any time constraints imposed by the Protective Order for the designation of documents were, in reality, self-imposed. *Id.* at 20–22. In addition, plaintiff asserts that the Oppikofer document is privileged on its face, and that Mr. Lee must have realized that the document was privileged when, sometime after July 31, he discovered the translation of it in the file folder. *Id.* at 23. Thus, plaintiff argues that these facts demonstrate that defendants' disclosure of the Oppikofer document was not "inadvertent," as defined by governing case law.

Plaintiff further contends that a finding of waiver would serve the interests of justice. Plaintiff asserts that defendants have filed a motion to dismiss based upon arguments which the Oppikofer document patently refutes. *Id.* at 28. Plaintiff maintains that the Oppikofer document evidences a joint venture agreement between the parties to share the costs of operating the TRC, including all future environmental liabilities, as alleged in their second amended complaint. *Id.* Plaintiff thus asserts that defendant's motion to dismiss was filed in bad faith.[9] *Id.*

Finally, plaintiff contends that defendants' conduct falls within the crime-fraud exception to the attorney client privilege. *Id.* at 29–30. Based upon the foregoing, plaintiff urges the Court to find that defendants waived the attorney-client privilege with respect to the Oppikofer document.

In reply, defendants maintain, among other things, that Mr. Lee did not realize that

---

**8.** Plaintiff also argues that the Court should not consider defendants' submissions, consisting of two affidavits from Matthew D. Lee, Esq., because the affidavits do not constitute competent evidence. Plaintiff argues that the affidavits are based upon the hearsay statements of Thomas DiBiase, Esq., from whom defendant, at the time of the filing of the initial briefs, had failed to obtain an affidavit. *Plaintiff's October 6, 1995 Brief* at 18. However, defendants subsequently provided the Court with an affidavit by Mr. DiBiase on October 20, 1995, *see Defendants' October 20, 1995 Brief,* Exhibit 4. To the extent that Mr.

DiBiase's affidavit addresses conversations or facts attested to by Mr. Lee, Mr. DiBiase's affidavit will control.

**9.** Plaintiff further argues that defendants acted in bad faith when they elicited testimony from Mr. Hediger which contradicted the statements contained in the Oppikofer document, but neither showed the witness the Oppikofer document, nor permitted plaintiff to show the document to him. *Plaintiff's October 6, 1995 Brief* at 28–29.

the Oppikofer document was privileged when he discovered it in the file folder. *Defendants' October 20, 1995 Brief* at 6.[10] Defendants further contend that plaintiff has failed to establish the elements of the crime-fraud exception to the attorney-client privilege, and thus, that plaintiff's crime-fraud claim should be rejected. *Defendants' October 20, 1995 Brief* at 12.[11]

### Discussion

Because both parties agree that the Oppikofer document is protected by the attorney-client privilege,[12] the only issue is whether defendants inadvertently disclosed the Oppikofer document.

■ "The inadvertent production of a privileged document is a specter that haunts every document intensive case." *Federal Deposit Ins. Co. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 479–80 (D.C.Va.1991). The question of whether inadvertent disclosure constitutes a waiver of the attorney-client privilege has generated three distinct schools of thought. *Id.* at 480–81; *Meridian Mortgage Corp. v. Spivak*, Civ.A. No. 91–3932, 1992 WL 205640 (E.D.Pa. Aug. 14, 1992); *see generally* 8 Charles Wright, Arthur Miller, & Richard Marcus, *Federal Practice and Procedure* § 20.16.2 at 241 (1994).

One line of cases holds that the inadvertent disclosure of a privileged document vitiates the privilege and constitutes a waiver. *See Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed.Cir.1990); *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989). At the other end of the spectrum lies a line of cases which espouse the "no waiver" rule. *See Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 753 F.Supp. 936, 938 (S.D.Fla.1991); *Helman v. Murry's Steaks*, 728 F.Supp. 1099, 1104 (D.Del.1990); *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954 (D.C.Ill.1982). This rule provides that an attorney's negligence cannot waive the privilege because the client, and not the attorney, is the holder of

---

**10.** While one of the Oppikofer document translations discovered by Mr. Lee contained the heading "internal memo" from the "legal department," defendants assert that this heading would not necessarily have indicated to Mr. Lee that the document was privileged. *Defendants' October 20, 1995 Brief* at 6. Defendants explain that, because Mr. Oppikofer acted as both legal counsel and a member of TRC's Board of Directors, many documents authored by him contained business, rather than legal, advice, and thus were not privileged. *Id.* Furthermore, Mr. Lee avers that he only "mechanically" compared the documents in the file to the documents designated for the depositions to determine whether they were the same. *2d Lee Supp.Aff.* at ¶ 11.

**11.** In its sur-reply letter dated October 30, 1995, plaintiff first contends that defendants knowingly produced the Oppikofer document without taking any precautions against its disclosure. *Plaintiff's October 30, 1995 Letter Brief* at 2–3. Plaintiff maintains that the letter is privileged on its face, and that no "attorney reading the Memorandum [could] be ignorant of its nature." *Id.* at 3. In addition, plaintiff asserts that defendants had two opportunities to review this manifestly privileged document in English: the first was when Mr. Lee discovered the translations in the file folder; and the second was prior to the translations' production to plaintiff. *Id.*

Second, plaintiff argues that defendants lacked a reasonable basis to believe that the database only contained non-privileged documents. *Id.* at 4. Third, plaintiff argues that defendants failed to take any precautions to separate the Oppikofer document from other non-privileged documents. *Id.* Fourth, plaintiff maintains that Mr. Lee's telephone call to Mr. DiBiase on August 23, 1995 evidences his knowledge at that time that the Oppikofer document was privileged. *Id.* at 5. Fifth, plaintiff contends that attorneys knowledgeable of defendants' document production practices are still employed by defendants. *Id.* Finally, plaintiff asserts that defendants took no remedial measures after the disclosure of the Oppikofer document until ordered to do so by the Court. *Id.* at 6.

Defendants responded to plaintiff's sur-reply letter on November 2, 1995. In that letter, defendants maintain that plaintiff's October 30, 1995 letter is "replete with gross misrepresentations and wild speculations about the facts in this case." *Defendants' November 2, 1995 Letter* at 2. Defendants maintain that contrary to plaintiffs' contentions, their briefs and affidavits make imminently clear that they did not knowingly turn over the Oppikofer document. *Id.* at 4. Defendants further assert that the precautions taken to preserve the confidentiality of their privileged documents were reasonable, given "the prolonged duration of this litigation, the massive number of documents required to be reviewed and produced by both sides, and the large number of attorneys necessarily involved in this case." *Id.* at 5.

**12.** *Defendants' October 6, 1995 Brief* at 1 n. 1; *Plaintiff's October 6, 1995 Brief* at 23 (Oppikofer document is, on its face, protected by the attorney-client privilege).

the privilege. *Marine Midland,* 138 F.R.D. at 481.

The third approach takes the middle of the road, and focuses upon the reasonableness of the steps taken to preserve the confidentiality of privileged documents. This approach considers inadvertent disclosure to be a form of waiver. *Id.* In general, a waiver must be a knowing and intentional act to be effective. *Id.* While an inadvertent disclosure is, by definition, an unintentional act, if such a disclosure results from gross negligence, courts following the third approach will deem the disclosure to be intentional, thus constituting a waiver of the privilege. *Id.* While the Third Circuit has not addressed which approach controls,[13] several district courts in this Circuit,[14] as well as courts in other circuits,[15] have endorsed the third approach.

These courts apply a multi-factor test to determine whether a disclosure was inadvertent, considering: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be served by relieving the party of its error." *Advanced Medical, Inc. v. Arden Medical Sys., Inc.,* Civ.A. No. 87–3059, 1988 WL 76128 at *2 (E.D.Pa. July 18, 1988). This Court is in agreement with the third approach, and will accordingly apply it to the facts of this case.

■ Defendants maintain, however, that the above-referenced case law is inapplicable to the instant case, and instead cite to Para-

---

13. In *Redland Soccer Club, Inc. v. Department of the Army,* 55 F.3d 827, 856 (3d Cir.1995), the Third Circuit held that the district court did not err in concluding that the Army's disclosure of five documents was inadvertent and did not constitute a waiver of the attorney-client privilege. While not specifically stating which approach it endorsed, the court, in rejecting the plaintiff's contention that the "importance of the documents" should be considered in determining waiver, noted that "[t]he importance of documents is relevant to the balancing of interests." *Id.* Thus, *Redland Soccer* implies that the Third Circuit would adopt a balancing test to determine whether an inadvertent disclosure constitutes a waiver.

14. *See Rotelli v. 7–Up Bottling Co. of Philadelphia,* Civ.A. No. 93–6957, 1995 WL 234171 at *2 (E.D.Pa. Apr. 19, 1995) (finding no waiver by inadvertent disclosure where precautions, including post-designation review, were reasonable and where documents, while reviewed by opposing attorney, had not actually been produced); *United States v. Keystone Sanitation Co.,* 885 F.Supp. 672, 676 (M.D.Pa.1994) (finding waiver by inadvertent disclosure where no reasonable precautions taken; there was no immediate deadline for completion of production and producing party failed to seek extension for creation of privilege log); *Meridian Mortgage Corp. v. Spivak.,* Civ.A. No. 91–3932, 1992 WL 205640 at *3 (E.D.Pa. Aug. 14, 1992) (while not reaching issue of waiver, discussing three approaches to inadvertent disclosure and noting that reasonable precautions not taken to protect confidentiality of document in issue); *In re Atlantic Fin. Fed. Sec. Litig.,* Civ.A. No. 89–645, 1992 WL 50074 (E.D.Pa. Mar. 3, 1992) (finding no waiver by inadvertent disclosure where, although no evidence of reasonable precautions, other factors counselled in favor of

preserving confidentiality); *Prebilt Corp. v. Preway, Inc.,* Civ.A. No. 87–7132, 1988 WL 99713 at *2–*3 (E.D.Pa. Sept. 23, 1988) (finding inadvertent disclosure amounted to a waiver where a large number of documents were disclosed and where there were no severe time constraints on production); *Advanced Medical, Inc. v. Arden Medical Sys., Inc.,* Civ.A. No. 87–3059, 1988 WL 76128 at *2 (E.D.Pa. July 18, 1988) (finding that precautions taken to prevent inadvertent disclosure were inadequate where, among other things, there were no severe time constraints placed on production and where documents were on their face clearly privileged).

15. *Bud Antle, Inc. v. Grow–Tech, Inc.,* 131 F.R.D. 179, 183 (N.D.Ca.1990) (finding waiver by inadvertent disclosure where plaintiffs failed to take reasonable precautions to protect privileged documents); *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 174 (D.Kan.1989) (finding no waiver where procedures employed, including screening, were adequate to prevent inadvertent disclosures given the scope of discovery); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 50 (M.D.N.C.1987) (finding waiver by inadvertent disclosure where precautions taken to protect confidentiality were insufficient); *Hartford Fire Ins. Co. v. Garvey,* 109 F.R.D. 323, 329–30, 331 (N.D.Ca.1985) (finding waiver of work product immunity where there was a "complete failure to take reasonable precautions"); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y. 1985) (holding that disclosure of 22 documents out of 16,000 pages inspected and out of 3,000 pages requested was inadvertent, and did not constitute a waiver, where reasonable precautions taken to protect privilege).

graph 19 of the Protective Order as authority for their argument that no waiver resulted from their disclosures of the Oppikofer document. *Defendants' October 6, 1995 Brief* at 7. Defendants circularly argue that their disclosures were "unintentional," the only definition which defendants attach to the word "inadvertent," and that, because their disclosures were unintentional, they were inadvertent. *Id.* Defendants conclude that the Protective Order immunizes all unintentional disclosures against any waiver argument. This Court disagrees with this argument, for the same reasons as it expressed during the April 5, 1994 hearing.

During the April 5, 1994 hearing, the Court rejected plaintiff's counsel's suggestion that the Protective Order include a "blanket" inadvertent disclosure provision which would permit the parties to turn over documents without a privilege review, and then assert claims of privilege after production. The Court found that such a provision would be inconsistent with controlling case law. It instead admonished counsel that, to preserve a claim of privilege, they must conduct a privilege review prior to any document production.

Defendants' interpretation of the Protective Order's inadvertent disclosure provision, however, renders it a "blanket" disclosure provision. Under defendant's construction, if a party "unintentionally" produced a privileged document without conducting a privilege review, it could thereafter successfully assert a claim of privilege. The Court expressly rejected this construction.

 As discussed previously, every inadvertent disclosure is an unintentional disclosure. Establishing that a disclosure was unintentional, therefore, does not go far in establishing the absence of waiver. Rather, the party resisting a waiver argument must demonstrate that it undertook reasonable precautions to avoid inadvertent disclosures of privileged documents. *Marine Midland,* 138 F.R.D. at 482. Defendants have not, however, met this burden. The relatively small size of the document production at issue, the lack of time constraints, combined with defendants' own admissions that they failed, on two occasions, to conduct any privilege review prior to producing copies of the Oppikofer document, compel a finding of waiver in this case.

The first disclosure occurred on July 31, 1995, in connection with the designation of 681 documents for the Hediger and Benz depositions. Of the 681 documents designated, 381 documents were in German. Included among the German documents were two copies of the original Oppikofer document. A 681 document production is neither massive nor uncontrollable by today's standards, and a privilege review preceding the production of these documents was not impracticable.

Defendants maintain, however, that their failure to conduct a privilege review was the result of their reasonable reliance upon former associates' representations that all documents on the firm's litigation database had been previously produced to plaintiff, and thus previously reviewed for privilege. This reliance was unreasonable. According to Mr. DiBiase, in September, 1992, former counsel, following a privilege review, withheld the Oppikofer document from production in connection with the deposition of Dr. William Luthy, and thereafter conducted thorough privilege reviews prior to document productions presumably from this same litigation database. *DiBiase Aff.* at ¶¶ 6–8. Thus, former counsel's practice was to conduct privilege reviews prior to disclosure, and present counsel's failure to verify this practice, and instead rely upon vague and unspecified conversations regarding the database, amounts to inexcusable neglect. Furthermore, conspicuously absent from Mr. DiBiase's affidavit is any statement regarding the information which he purportedly provided to defense counsel which would cause them to assume that the documents on the database had all previously been produced to plaintiff's counsel and thus previously reviewed for privilege.

Defendants' related argument that "associate turnover" contributed to their misapprehension that all documents contained on the database had been previously disclosed to plaintiff similarly carries no weight. It is incumbent upon counsel, when there is a change in legal personnel, to ascertain the

procedures implemented by prior counsel to protect privileged documents. Defense counsel did not satisfy this obligation.

With regard to the first disclosure, defendants further complain that they did not have enough time to translate the German documents because of the forty-five day deadline imposed by the Protective Order for the designation of exhibits prior to depositions. Defendants assert that, as a result of this deadline, they had only two weeks from the date on which they noticed the Benz and Hediger depositions to produce the documents which they wished to designate. These excuses are unpersuasive.

As stated by plaintiff, the time constraints of which defendants complain were self-imposed. Defendants voluntarily agreed to the terms of the Protective Order, and were well aware of those terms, including the deadline for the designation of deposition exhibits, when they noticed the depositions of Benz and Hediger to take place the week of September 11, 1995. Indeed, it was defense counsel who initiated the depositions. To now assert that they were at the mercy of Protective Order's terms is unavailing. *See Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 331 (N.D.Ca.1985) (rejecting argument that "rushed schedule" for deposition contributed to inadvertent disclosure of protected documents, noting that it was the disclosing party who had "initiated the deposition and set up the scheduling").

In addition, a two-week period within which to have 381 German documents translated is not unreasonable within the context of this case. Defense counsel should have been aware that many of the documents relevant to the Hediger and Benz depositions were in German. At this stage in the litigation, the Court expects that counsel is knowledgeable of the nature of their own witnesses, as well as the testimony which they will contribute. In determining when to notice the Benz and Hediger depositions, counsel should have factored in a sufficient amount of time to have translated the German documents relevant to these depositions. These facts, together with counsel's prerogative to notice depositions and their awareness of the Protective Order's deadlines, foreclose any argument that the Oppikofer document was inadvertently disclosed because the Protective Order's time constraints proved too stringent. *See Prebilt Corp. v. Preway, Inc.*, Civ.A. No. 87–7132, 1988 WL 99713 at *3 (E.D.Pa. Sept. 23, 1988) (holding inadvertent disclosure resulted in a waiver of attorney-client privilege where, among other things, disclosing party was under no time constraints).

The second production occurred on August 29, 1995, when counsel produced the English translations of the Oppikofer document. This second failure to conduct a privilege review is even less excusable than the first given that these documents were in English, that there were only 381 documents involved in this second production, and that counsel had one month within which to review these documents—from July 31, the date of the first production, until August 29, the date of the second production. Defense counsel again asserts that its failure to review these English documents for privilege was justifiable because they reasonably relied upon former associates' representations that the documents had been previously produced. The Court finds that this reliance was misplaced for the reasons previously discussed, and because, as defense counsel candidly admit, *Defendant's October 6, 1995 Brief* at 1 n. 1, the English translations of the document are, on their face, protected by the attorney-client privilege. *See Parkway Gallery Furniture, Inc. v. Kittinger Pennsylvania House Group, Inc.*, 116 F.R.D. 46, 51 (M.D.N.C. 1987) (holding inadvertent disclosure resulted in waiver where, among other things, document was privileged on its face and "there appear[ed] to be little reason why it was not identified" as such). Hence, based upon the foregoing, the Court finds that counsel has failed to establish that it undertook reasonable precautions to prevent the inadvertent disclosure of the Oppikofer document, given the small size of the production at issue, the lack of time constraints, and counsel's inexcusable neglect, on two occasions, to conduct a privilege review prior to production. *See Marine Midland*, 138 F.R.D. at 482–83 (holding that privilege waived by inadvertent

disclosure where "party's screening effort was manifestly inadequate.").

The other factors relevant to the inadvertent-disclosure analysis also point toward a finding of waiver in this case. Defendants attested to the second factor, the number of inadvertent disclosures, indicating that they had inadvertently disclosed "23 pages" of privileged documents besides the six copies of the Oppikofer document. *Lee Supp.Aff.* at ¶ 12; *Defendant's October 6, 1995 Brief* at 4 n. 2; *Plaintiff's October 6, 1995 Brief* at 7, 13.[16] In a document production of this relatively small size—only 681 total documents—the disclosure of "23 pages" of privileged documents, in addition to the 6 copies of the Oppikofer document, constitutes further evidence that counsel's precautions with respect to the protection of privileged documents were manifestly inadequate.

The third factor—the extent of disclosure—also weighs in favor of a finding of waiving. The disclosure of the Oppikofer document was complete, as demonstrated by the substantive arguments made by plaintiff in support of its position. The fourth factor—efforts taken to rectify the error—further supports a finding of waiver. While defense counsel acted quickly to rectify the inadvertent disclosure of the Oppikofer document upon receiving a copy of plaintiff's September 8, 1995 letter to Judge Parell, its actions were in response to the second, and not the first, inadvertent production. The implementation of proper screening procedures might have prevented the second production of the translations of the Oppikofer document. But, as discussed previously, defendants' screening procedures were virtually nonexistent.

■ The fifth factor is whether the interests of justice would be served by a find-

ing of waiver. According to plaintiff, the Oppikofer document contradicts defendants' motion-to-dismiss claims, and a finding of waiver would serve the interests of justice by preventing defendants from, in effect, hiding the truth. The Court, however, declines to find a waiver on these grounds. "That the documents are relevant and probative does not determine the waiver question." *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.*, 133 F.R.D. 171, 174 (D.Kan.1989). The significance of the Oppikofer to defendants' motion to dismiss is a determination more appropriately left to the resolution of that motion, and has no place in this analysis. The Court, however, finds that the interests of justice would be served by a finding of waiver, where, as here, a party's negligence has resulted in the inadvertent production of a privilege document.[17]

Finally, because the Court finds that defendants waived the attorney-client privilege on other grounds, the Court will not reach plaintiff's arguments based upon the crime-fraud exception. Accordingly, the Court will deny defendants' motion for a Protective Order compelling plaintiffs to return copies of the Oppikofer document. The Court instead holds that defendants, by inadvertently producing the Oppikofer document under circumstances evincing an absence of reasonable precautions to preserve the confidentiality of the document, waived the attorney-client privilege with respect to the document. An appropriate Order shall follow.

**16.** Plaintiff asserts that these 23 pages translate into seven privileged documents. *Plaintiff's October 6, 1995 Brief* at 26.

**17.** The Court notes defendants' contention that plaintiff's counsel violated their ethical obligations when, upon receiving the translated copies of the clearly-privileged Oppikofer document, they failed to refrain from examining it and to notify defense counsel of their receipt of the document, and instead attached a copy of the document to a letter to Judge Parell. *Defen-*

*dants' October 20, 1995 Reply Memorandum* at 6 n. 6. Because plaintiff's counsel received six copies of the document over the course of two productions, and because the second production involved English translations which defendants admit were clearly protected by the attorney-client privilege, plaintiff's counsel reasonably may have assumed that defense counsel intended to produce the document. Thus, plaintiff's counsel's actions present no clear ethical violation.