**KOCH MATERIALS COMPANY,**
Plaintiff,

v.

**SHORE SLURRY SEAL,**
**INC., Defendant.**

**No. 01–CV–2059(SMO).**

United States District Court,
D. New Jersey,
Camden Vicinage.

May 1, 2002.

---

Stephen B. Nolan, Stradley, Ronon, Stevens & Young, LLP, Cherry Hill, NJ, for Plaintiff.

Neil C. Schur, Stevens & Lee, P.C., Cherry Hill, NJ, for Shore Slurry Seal, Inc.

Shawn J. Lau, Shawn J. Lau, P.C., Pennsauken, NJ, for E.J. Breneman, Inc.

Francis P. Maneri, Dilworth, Paxson, Kalish & Kauffman, LLP, Cherry Hill, NJ, Fredric Leigh Shenkman, Cooper, Perskie, April, Niedelman, Wagenheim & Levenson,

Atlantic City, NJ, for Asphalt Paving Systems, Inc.

## ORDER

ROSEN, United States Magistrate Judge.

Presently before the court are three motions: (i) the motion of Neil C. Schur, Esquire, counsel for Defendant Shore Slurry Seal, Inc. ("Shore Slurry"), to compel discovery of Plaintiff Koch Materials Company ("Koch"), pursuant to Fed.R.Civ.P. 37 (Doc. No. 64–1), (ii) the cross-motion of Stephen B. Nolan, Esquire, counsel for the plaintiff, for a protective order pursuant to Fed.R.Civ.P. 26 (Doc. No. 68–1), and (iii) the motion of Shawn J. Lau, Esquire, counsel for non-party E.J. Breneman, to quash a subpoena (Doc. No. 87–1), pursuant to Fed.R.Civ.P. 45(c)(3), and for the admission pro hac vice of John J. Speicher, Esquire and Kevin A. Moore, Esquire, pursuant to L. Civ. R. 101.1 (Doc. No. 86–1); and the court having considered the submissions of the parties; and the court having further considered the argument of counsel conducted on the record on April 5, 2002; and

THE COURT NOTING that Shore Slurry seeks to: (1) reproduce a witness to testify about his handwriting on documents produced by Koch; (2) produce for in camera review documents related to that same subject matter; (3) produce complete and unredacted attachments to certain documents already produced; and (4) produce in unredacted form certain other allegedly improperly redacted documents. (See Defendant's Brief, Page 2). The plaintiff opposes production of any of this information. In opposition, the plaintiff asserts that all categories of documents identified are protected either by the attorney-client privilege or the attorney work product doctrine. The plaintiff has also cross-moved for the return of certain documents authored by it's in-house counsel, Ronald Hull, Esquire, asserting that it inadvertently disclosed these documents; and

THE COURT FURTHER NOTING the following relevant factual and procedural background. In April of 2001, Koch filed a complaint against Shore Slurry containing three counts: (1) breach of an Exclusive Supply Agreement; (2) breach of the Novachip Sublicense Agreement; and (3) breach of implied covenant of good faith and fair dealing. (See Complaint). Koch's claims derived from three contracts between Koch and Shore Slurry, entered into and signed on February 18, 1998. The first contract was a Sale and Purchase Agreement in which Koch purchased emulsion plant assets from Shore Slurry and purchased the right to utilize Novachip. The second contract was an Exclusive Supply Agreement in which Shore Slurry agreed to purchase all of its emulsion products from Koch and Koch agreed to charge a price that was no higher than the price charged to a competitor purchasing similar volumes during the time periods. The third contract was the Novachip Sublicense Agreement by which Shore Slurry had an exclusive license to use the Novachip in a limited geographical region consisting of New Jersey, Delaware, and Pennsylvania, and North Carolina. (See Defendant's Brief, at 2, 3).

On May 18, 2001, Shore Slurry filed an answer and asserted a number of affirmative defenses. On October 24, 2001, Koch amended its complaint and added the following claims against Shore Slurry: (1) failure to provide adequate assurances-Exclusive Supply Agreement; (2) failure to provide adequate assurances-Sublicense Agreement; (3) breach of contract-Exclusive Supply Agreement; and (4) breach of implied covenant of good faith and fair dealing. (See Amended Complaint, Counts I, II, III, IV). Koch also added Asphalt Paving Systems as a defendant and asserted the following claims against that entity: (1) tortuous interference with contractual relations; and (2) breach of contract-Exclusive Supply Agreement. (Amended Complaint, Counts V, VI). On November 16, 2001, Shore Slurry filed an answer to the amended complaint, which contained affirmative defenses, a cross claim against Asphalt Paving Systems, and a counterclaim against Koch. Shore Slurry's counterclaim asserted claims of breach of the Exclusive Supply Agreement and violations of the Robinson–Patman Act. Both claims were based upon Koch's alleged discriminatory price of products sold to Shore Slurry

under the Exclusive Supply Agreement from 1998 to the present. (Defendant's Brief, Page 3).

Notwithstanding the apparent variety of document categories requested, the disclosure of three handwritten documents forms a causal nexus for all categories in the request. The three documents are hand written comments by Ronald Hull, Esquire, in-house counsel for Plaintiff Koch. The defendant essentially contends that these documents contradict earlier representations made by the plaintiff on matters relevant to this law suit. This perception of the contents of these Hull documents appears to have tainted other document production by the plaintiff, thus resulting in a bevy of requests, all of which presuppose improper withholding of information by the plaintiff. Consequently, to better understand the defendant's request, the court shall first review the circumstances under which the Hull documents were disclosed.

### a. The Handwritten Documents of Ronald Hull, Esq.

An aura of distrust between the parties has surrounded this litigation from its inception. The complaint, filed on April 27, 2001, was followed quickly with the plaintiff's motion for expedited discovery. The basis for this motion was the plaintiff's belief that the defendant would not properly maintain documents; indeed, the plaintiff represented that it feared the destruction of documents important to the litigation. The court heard oral argument on the motion on May 18, 2001, and by order dated May 21, 2001, the court granted both parties the opportunity to conduct expedited discovery and shortened the time within which to respond to the discovery requests served to twenty days.

On May 25, 2001, Shore Slurry served its first set of requests for production of documents and its first set of interrogatories upon Koch. (D's Brief, at 3). In June 2001, Koch produced more than six thousand documents in response to Shore Slurry's request for documents. (P's Opp., at 4). Included within these documents were numerous handwritten pages with no indication of the scrivener's identity. (D's Brief, at 3). After

Shore Slurry inquired about the author of the handwritten documents, Koch's counsel sent a letter identifying the authors. Significantly, Koch identified Ronald Hull, Esquire, Koch's in-house counsel, as the author of six of the handwritten documents. In a letter dated November 28, 2001, counsel for Koch requested that three of those six documents written by Mr. Hull be returned to the plaintiff. (*See* Letter of Neil C. Schur, Esq., at 4, citing Documents numbered 1489, 3414, and 3760 as privileged, attached as Ex. B to D's Brief). Koch asserted that the three documents were protected by the attorney-client privilege and/or the work product doctrine. (*See id.*). The defendant refused to return the documents.

On December 5, 2001, Mr. Hull underwent a deposition during which he was questioned, inter alia, about the six documents which contained his handwriting. (D's Brief, at 5). With respect to the process of the documents' production, Mr. Hull stated that once he received the request to produce documents, he gave his entire file of materials on Shore Slurry to his secretary, who then gave the file of materials to Kevin Bright, another in-house attorney for Koch. (*See* Deposition of Ronald Hull, T. 32:7–18, attached as Ex. D to D's Brief). Mr. Hull stated that he did not review the documents for privileged information before giving them to his secretary. (*Id.*). Instead, he asserts that he relied on litigation counsel to conduct the necessary inquiry and to ensure that the file did not contain any privileged information. (*Id.* T. 34:7–10, 35:3–8).

Mr. Bright numbered the materials and forwarded them to Wendy McGraw, Esq., then-outside counsel for Koch. (*See* D's Brief, at 6). On June 27, 2001, Ms. McGraw, produced the materials to Shore Slurry. (*Id.*, at 5–6). Mr. Hull stated that at no time was he consulted by Bright about whether Mr. Hull was the scrivener of any handwriting or whether any documents were subject to the attorney-client privilege or work-product doctrine. (*See* Hull Dep., T. 35:9–15).

Throughout the deposition, counsel for Koch allowed questioning of Mr. Hull about the three documents to the extent that it did not encroach on privileged communications

between Mr. Hull and other Koch employees. (*See* Hull Dep. portions attached as Ex. D to D's Brief, *passim* ). However, a dispute evolved when counsel for Shore Slurry indicated that he considered the disclosure of the documents to constitute waiver of privilege with respect to the entire subject matter of the documents. (*See id.* T. 173:1–19). Interestingly, plaintiff's counsel indicated that he would allow questions related to the documents, if counsel for the defendant would limit his assertion of waiver to the answers given by Mr. Hull related to the documents. Indeed, counsel stated that he did not see that Koch would have an expectation that the information gathered by Hull and then transcribed into the documents would necessarily remain confidential. Counsel for Shore Slurry, however, maintained his assertion that both the disclosure and any discussion of the disclosed documents constitutes a full subject matter waiver. For example, with respect to document number 3760, counsel discussed the following:

> Mr. Ceramella [Koch's counsel]: Just for the record, Mr. Hittinger, I'm not sure there is anything in here that you've established would be privileged or that there would be an expectation that it be kept confidential. I'd be willing to lift the privilege designation on 3760, so long as you won't assume that that's some sort of waiver of privilege. If you're going to take the position that it's a waiver of the privilege, then we will ask for it to be returned as inadvertently reduced (sic).

> Mr. Hittinger: Well, first I'm not going to return it to you as inadvertently produced, and I'm not going to return any of the documents that you say were inadvertently produced, because they weren't inadvertently produced[.] ... And we would take the position that the documents produced waive the privilege as to the subject matter of the documents[.]

(Hull Dep. T. 67:7 to 68:10). And on document number 1489, the following colloquy occurred:

> Q: Was CSS–1h sold at Reading?

> Mr. Ceramella: If you know, without going into any conversation.

A: Without going into any conversation, I can't answer that.

Q: Well, you wrote "CSS–1h sold at Petty's."

A: I did write that.

Q: That's what you understood, correct?

Mr. Ceramella: Well, if you had an independent understanding, you can answer. If it's based on a conversation, don't answer.

A: The only way I can have an understanding of this is what my clients tell me.

Mr. Hittinger: Well, Mike, he has already testified that he spoke to Klinger, and he wrote this down. We know Klinger told him this. Come on, this is silly.

Mr. Ceramella: Well, we don't. It is—

Mr. Hittinger: We're wasting a lot of money bringing this witness back. Why don't you just let him answer the question.

Mr. Ceramella: I would if you would agree that it's not a waiver of the privilege, but you are not agreeing, so we will do it the hard way.

Mr. Hittinger: What are you asking me to agree to? Waiver of what privilege?

Mr. Ceramella: *I will let him answer questions about this, so long as you will agree that it doesn't constitute a waiver of any attorney-client privilege, except the questions and answers you are given on this document.*

Mr. Hittinger: You know I can't agree to that, because the law lets me state it as a waiver. So I will keep asking the questions.

(Hull Dep. T. 172:3 to 173:19) (emphasis supplied). The instant motion to compel and cross-motion for return of the documents ensued.

Relying on the five factors considered by the Judge Wolfson in her very thoughtful opinion *Ciba–Geigy Corp. v. Sandoz Ltd.*, 916 F.Supp. 404 (D.N.J.1995), Shore Slurry asserts that it should be able to retain the Hull documents because (1) Koch took no steps to ensure that privileged documents were not inadvertently disclosed, (2) the extent of the disclosure was total, (3) Koch took minimal steps to retrieve the documents, and (4) the interests of justice weigh in Shore Slurry's

favor. (*See* D's Brief, at 8–11; Reply, at 2–4).

In its opposition, Plaintiff Koch asserts that the attorney-client privilege in these documents was protected by an agreement made between the plaintiff and the defendant. (Plaintiff's Brief in Opposition and Cross–Motion ("P's Opp."), at 7). Specifically, the plaintiff directs this court to a June 11, 2001 letter from counsel for Shore Slurry to Koch which identifies a purported agreement relating to handwritten documents contained in document production. (P's Opp., Ex. A). The letter accompanied Shore Slurry's responses and objections to Koch's first set of interrogatories and request for production of documents, and states in relevant part, "[p]lease note that we will only produce documents that bear handwritten attorney or client comments if you will agree not to argue waiver of attorney-client privilege, attorney work product, or any other applicable protection." (P's Opp., Ex. A). On June 13, 2001, Koch responded to Shore Slurry's letter dated June 11, 2001, stating " [w]e agree to that condition, which will also apply to Koch's document production." (P's Opp., Exhibit B). Thus, Koch contends that it produced documents in response to Shore Slurry's first set of interrogatories and request for documents in June 2001, in reliance to the June 11, 2001 agreement. (P's Opp., at 3).

On June 27, 2001, Koch produced more than six thousand documents, including the three handwritten documents at issue, in response to Shore Slurry's First Set of Interrogatories and Request for Production of Documents. (P's Opp., at 4). In its cover letter, dated June 27, 2001, Koch stated, "[t]he documents are being produced pursuant to the following agreement: (1) all documents marked confidential are for attorney's eyes only, until such time as the parties enter into a protective order; and (2) you will not assert any waiver of privilege based on the documents produced." (*Id.*, Ex. C). The letter also stated, "[p]lease call me if you have any questions, or if I have misstated our agreement concerning document production." (*Id.*). Shore Slurry did not respond to this letter in any manner. (*Id.*, at 4).

Thus, Koch contends that the inadvertently produced documents were protected under the discovery agreement, which was reasserted before the production of documents. (*Id.*, at 7–8). Koch further argues that by accepting the documents on the terms of the agreement, which was restated in the cover letter preceding the production, the agreement was still effective and did not waive any attorney client privilege. (*Id.* at 8). Thus, Koch argues that the three documents are still protected and cross moves for the return of the three documents. (*Id.* at 19).

The defendant disagrees with this characterization of the document production agreement. The defendant contends that the agreement pertained to a specific set of documents, not every document produced. (*See* Affidavit of Neil C. Schur, ¶ 8–9, attached as Ex. F to Defendant's "Opposition to Plaintiff and Counterclaim Defendant Koch Materials Company's Cross–Motion for Return of Privileged Documents" (hereinafter "D's Reply")). The defendant further argues that Koch's reciprocal agreement pertained only to a similar set of documents, and by this limited agreement, both parties did not intend to eliminate all possibility of waiver of the attorney-client privilege by the inadvertent disclosure of otherwise privileged documents. (*Id.* at ¶ 8). Specifically, Shore Slurry argues that the agreement was intended only to pertain to certain drafts of contracts that counsel knew at the time of the production were arguably privileged, but which counsel mutually agreed to produce nonetheless to comply with the expedited discovery schedule. (*Id.* at ¶ 9). Shore Slurry thus argues that the discovery agreement does not protect Koch's inadvertent disclosure of documents which were not draft contracts from waiver of the attorney client privilege.

**b. Documents Pertaining to the Subject Matter of the Hull Documents**

Shore Slurry asserts not only that Koch is not entitled to the return of the documents but also that partial disclosure constitutes a waiver by implication of all documents with the same subject matter. (*See* D's Brief, 12–14; D's Reply, at 5). In its papers, Shore Slurry generally identified the subject matter

as any documents related to the internal pricing investigation conducted by Koch into Shore Slurry's 1999 pricing discrimination claim. (*See* D's Brief, at 13). At oral argument, counsel supplemented this general identification with a specific reference to items in Koch's privilege log and to certain e-mails and other documents reviewed by Mr. Hull as part of Koch's internal pricing investigation. These items, Shore Slurry argues, are either not privileged or, if privileged, the privilege has been waived because of the disclosure of the Hull documents. Shore Slurry further asserts that subject matter waiver must be found as the three documents disclosed appear to be directly contrary to Koch's present position that the products sold to Shore Slurry were of different kind and quality than those sold to Shore Slurry's competitors. (D's Reply, at 5). Shore Slurry maintains that Koch should not be permitted to assert such contrary positions, and as such, should be required to produce all privileged documents pertaining to Koch's internal pricing investigation. (*Id.*). Alternatively, Shore Slurry requests that this court review the documents *in camera* for privilege. Shore Slurry further seeks an order requiring Mr. Hull to submit to a second deposition, answering all questions on the subject matter of the internal pricing investigation.

For its part, Koch contends that it has not waived any subject matter privilege with respect to the inadvertently disclosed documents and asserts that the disclosed documents should be returned pursuant to the parties' discovery agreement. (P's Reply, at 8, 10). The defendant refers to Koch's reliance on the discovery agreement as an "eleventh-hour" argument and urges the court to accept its interpretation of the agreement as limited to draft of contracts at issue in the litigation. (D's Reply, at 7).

Because the Hull documents raise for the defendant the specter of misrepresentation in the plaintiff's position on the subject matter of the law suit, the defendant seeks review of other documents produced by Koch in the litigation, either by its own eyes or that of the court. One such category of documents includes certain redacted documents. A sec-

ond category consists of withheld attachments to certain documents produced.

### c. The Redacted Documents and the Attachments

On November 21, 2001, Koch produced documents in response to Shore Slurry's first and second set of document requests. (D's Brief, at 4). Koch produced several redacted documents that were a part of its internal investigation in 2000 of Shore Slurry's contemplated price discrimination claim and an early 1999 audit of Shore Slurry. (*Id.*). Shore Slurry contends that it is entitled to the production of the redacted portions of documents Bates stamped KMC 8283, 8267, and 8268 (*see* documents attached to D's Brief, Ex. J), which were e-mails reviewed by Hull as a part of Koch's internal price investigation, because Koch has made a partial disclosure of in-house counsel's price discrimination investigation, and so should be required to produce the whole. (*Id.*, at 14–15). Shore Slurry similarly seeks full disclosure of the documents attached to the e-mails. (*See* D's Brief, at 15, Ex. H and I). The attachments were responses to Hull's requests for information to Koch employees in his investigation of Shore Slurry's price discrimination claim. (*See id.*).

Koch opposes producing the redacted portions of the e-mails, asserting that the redacted portions protected by the attorney-client privilege. Koch further objects to production of the attached documents, arguing that they are protected by the work-product doctrine. (P's Opp., at 17–18; P's Reply, at 12–13). Specifically, Koch argues that the e-mails contain confidential client communication related to legal advice. Similarly, Koch asserts that the attached documents in dispute were produced at the request of in-house counsel, Mr. Hull, in his pricing investigation. Koch posits that this investigation occurred in the shadow of potential litigation; thus, the documents are protected by the work product doctrine. (*Id.*). Shore Slurry argues that Koch has impliedly waived any work product protection of documents commenting on purchases by E.J. Breneman obtained as a part of Koch's internal investigation because of a partial disclosure of Shore

Slurry's spreadsheets. (D's Brief, at 15). Koch counters that it has not disclosed any confidential information regarding Shore Slurry's pricing information acquired during Koch's internal investigation. (P's Opp., at 18). Specifically, Koch asserts that it has not produced the internal comparison of Shore Slurry sales, but rather, Koch produced all responsive non-privileged documents. (*Id.*). Koch argues that because it disclosed only those portions of documents containing non-privileged information, there has been no waiver of privilege regarding the internal investigation.

Conversely, Shore Slurry contends that either the entire document is privileged, including the information pertaining to sales to both Shore Slurry and E.J. Breneman, or none of the document is privileged. (D's Reply, at 6). Shore Slurry reasons that if the entire document is privileged, then Koch's partial disclosure of the information constitutes an implied waiver of the entire subject matter. (*Id.*). Alternatively, Shore Slurry contends that none of the attachments contain protected information. According to Shore Slurry, the redacted documents are non-privileged materials because the investigation was not conducted by counsel, (i.e. Mr. Hull), but by Koch's financial employees, and contain financial results of comparative prices charged and bid results, which are purely factual and outside of the ambit of the work product doctrine. (D's Reply, at 6).

At oral argument, counsel for Koch represented to this court that it was indeed Mr. Hull who conducted the pricing investigation, who obtained information from various sources from which he could form a legal opinion responsive to the dispute between the parties. Koch argued that the attachments constitute Mr. Hull's work product, regardless of who actually created them, because they were created at his request in the shadow of litigation. Upon inquiry from the

court, counsel for Koch indicated that all underlying factual information contained within the redacted documents has been produced to Shore Slurry. Koch thus maintains that production of the work product is not necessary. Shore Slurry contested Koch's representation that all factual information has been produced, pointing specifically to discrepancies between the invoice price and the actual price paid by E.J. Breneman. Shore Slurry thus persisted in its request for full disclosure of the attached documents. Shore Slurry requested that the court either order the production or conduct an *in camera* review of the documents.

## I. DISCUSSION

### A. Privilege Doctrines

The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party, [and] ... [f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The attorney-client privilege and the work product doctrine are two separate principles intended to protect litigants from unfettered disclosure. *See Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

 The privileges noted in Rule 26(b)(1) are encompassed in Rule 501 of the Federal Rules of Evidence. Rule 501 states that the application of any claimed privilege is governed by the common law, unless otherwise provided by the Constitution or other federal statute.[1] In cases premised upon federal question jurisdiction, federal common law governs the evidentiary privileges, rather

1. Fed.R.Evid. 501 states in pertinent part:
 Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the

United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

than state law. *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 103 (3d Cir.1982); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J.1989). Moreover, "[w]here, as here, there are both federal and state law claims, federal privileges rather than state privileges apply to all claims." *Wei v. Bodner,* 127 F.R.D. at 94. Accordingly, federal common law shall govern those claims premised upon federal question jurisdiction as well as those premised upon state law. The party claiming the privilege has the burden of establishing that the privilege applies. *See Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084, 1089–90 (D.N.J.1996) (citing cases).

### 1. *Attorney–Client Privilege*

■ The United States Supreme Court has recognized that the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir.1979) ("the attorney-client privilege exists to foster disclosure and communication between the attorney and the client"). No bright-line rule governs the applicability of the attorney-client privilege and, as a result, the applicability of the privilege should be determined on a case-by-case basis. *Upjohn,* 449 U.S. at 396–97, 101 S.Ct. 677. The Third Circuit has enumerated the traditional elements of the privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the

privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation,* 599 F.2d at 1233 (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)). Courts have found that because the privilege obstructs the search for the truth and because its benefits are, at best, "indirect and speculative," it must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Investigation,* 599 F.2d at 1245.

### a. **Waiver by Inadvertent Disclosure**

It is within this context that the doctrine of waiver of the attorney client privilege resulting from inadvertent disclosure by an attorney developed. Instructive on the issue of inadvertent disclosure is *Ciba–Geigy Corp. v. Sandoz, Ltd.,* 916 F.Supp. 404, 410–11 (D.N.J.1995). In *Ciba–Geigy,* the court reviewed the development of three distinct schools of thought regarding the waiver doctrine, falling along a continuum. *See Ciba–Geigy,* 916 F.Supp. at 410–411. On one end of the continuum, the cases rest all responsibility on the attorney, holding that the inadvertent disclosure of a privileged document vitiates the privilege and constitutes waiver. 916 F.Supp. at 410. *See also* Edna Selan Epstein, The Attorney Client Privilege and the Work Product Doctrine 317–18 (4th ed.2001). On the other end, the cases recognize the general precept that the client and not the attorney holds the privilege, and thus adopt a "no waiver" rule. *Id.* at 410–11. The third school seeks a middle ground which "focuses upon the reasonableness of the steps taken to preserve the confidentiality of privileged documents." *Id.*

■ In the middle ground of this third approach, the *Ciba–Geigy* court reasoned that general rules concerning waiver should apply equally in the inadvertent disclosure arena. The court noted that "[i]n general, a waiver must be a knowing and intentional act to be effective. While an inadvertent disclosure is, by definition, an unintentional act, if such a disclosure results from gross negli-

gence, courts following the third approach will deem the disclosure to be intentional, thus constituting a waiver of the privilege." *Id.* at 411. The court endorsed this third approach and considered the following factors:

> 1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; 2) the number of inadvertent disclosures; 3) the extent of the disclosure; 4) any delay and measures taken to rectify the disclosure; and 5) whether the overriding interests of justice would or would not be served by relieving the party of its error.

*Id.* Significant in consideration of these factors is the premise that merely "[e]stablishing that a disclosure was unintentional [ ] does not go far in establishing the absence of waiver. Rather, the party resisting a waiver argument must demonstrate that it undertook reasonable precautions to avoid inadvertent disclosures of privileged documents." *Id.* at 412. This court finds Judge Wolfson's reasoning in *Ciba–Geigy* persuasive and likewise endorses this third approach.

In *Ciba–Geigy,* the corporate defendant asked the court to compel the plaintiff corporation to return an internal memorandum which in-house counsel had written and addressed to an employee of the defendant. The parties did not dispute that the memorandum was privileged. Upon review of the above factors, the court held that "[t]he relatively small size of the document production at issue, the lack of time constraints, combined with defendant's own admission that they failed, on two occasions, to conduct any privilege review prior to producing copies of the ... document, compel a finding of waiver in this case." *Id.* at 412. The court further found that "counsel's failure to conduct a privilege review in two separate instances amounted to 'inexcusable neglect.'" *Id.* Significant in the court's analysis was the fact that the parties were subject to self-imposed time constraints regarding discovery and that, while counsel quickly attempted to rectify the second disclosure, the disclosure would not have occurred if counsel had initially implemented an appropriate review process. *Id.* at 414.

### b. "Blanket" Inadvertent Disclosure Agreements

In opposition to the defendant's motion, Koch relies primarily on a purported "discovery agreement" discussed above. The agreement was memorialized in a June 11, 2001, letter from Shore Slurry's counsel, which states in relevant part, "[p]lease note that we will only produce documents that bear handwritten attorney or client comments if you will agree not to argue waiver of attorney-client privilege, attorney work product, or any other applicable protection." (P's Opp., Ex. A). Koch reiterated the agreement in a June 13, 2001, response letter, stating "[w]e agree to that condition, which will also apply to Koch's document production." (P's Opp., Exhibit B). Koch urges the court to accept its interpretation of that agreement, that it applies to all documents produced by either side in any production.

Courts generally frown upon "blanket" disclosure provisions as contrary to relevant jurisprudence. *See Ciba–Geigy,* 916 F.Supp. at 412. In particular, the court observes that such blanket provisions, essentially immunizing attorneys from negligent handling of documents, could lead to sloppy attorney review and improper disclosure which could jeopardize clients' cases. Moreover, where the interpretation of the provision remains hotly disputed, as it is in this case, broad construction is ill advised. Consequently, the court shall not apply the plaintiff's proffered blanket provision in the litigation. Instead, the court shall review the parties' substantive waiver arguments.

### c. Waiver as to the Hull Documents

■ Koch argues that, in considering the *Ciba–Geigy* factors, it has not waived its attorney client privilege as to the three Hull documents. Koch likens its situation with that considered by the court in *Fidelity and Deposit Company of Maryland v. McCulloch,* 168 F.R.D. 516 (E.D.Pa.1996). In *Fidelity,* the court considered two instances of inadvertent disclosure by a corporate plain-

tiff. After reviewing the five *Ciba–Geigy* factors, the court found that the first episode of inadvertent disclosures did not waive the privilege, while the second did waive the privilege. Significant to the court in the first instance were the following facts: (i) that Fidelity's attorneys had spent over seven hours reviewing the documents, tagging the privileged items; (ii) the number of disclosures (fewer than 10 documents) relative to the extent of the production (over 5,000 pages) was minimal; (iii) that the documents disclosed no significant facts concerning the substance of any legal opinion; and (iv) that the discovery time line was tight. 168 F.R.D. at 522. The court waived the privilege in the second instance of inadvertent disclosures, finding "carelessness with respect to the second disclosures." *Id.* at 523. The court found significant that Fidelity attorneys had reviewed the documents at least twice before disclosing them. Also important to the court was the fact that although the disclosure was limited (only six documents out of several thousand produced), at least two of the documents went to the heart of the privilege that Fidelity asserted in the case, describing "in considerable detail the substance of outside counsel's legal opinion as to Plaintiff's liability under the [relevant] claims." *Id.* The court concluded that, had reasonable precautions been taken, the disclosure would not have occurred. *Id.*

Although Koch attempts to analogize its disclosure to the first Fidelity incident, this court finds that Koch's disclosure is more akin to the second Fidelity incident. Koch asserts that it twice reviewed the documents prior to disclosure (*see* P's Opp., at 12), yet those attorneys never sought the authors of handwriting on documents that it produced. The substance of Koch's privilege log also militates for waiver. The log clearly identifies information related to the Koch internal investigation, particularly as concerned Mr. Hull's contribution, as privileged information. Yet, the three documents at issue were authored by Mr. Hull and speak to this very topic. Thus, although the number of privileged documents produced was small relative to the production, the documents are central to Koch's asserted privilege.

Finally, the court finds the plaintiff's position at Mr. Hull's deposition instructive as to the plaintiff's efforts to retrieve the documents. As noted above, Koch's counsel indicated that the individual documents did not appear necessarily to warrant protection, but Koch's counsel felt constrained to assert the privilege against Shore Slurry's position that their production resulted in a broad subject matter waiver. Given this original position by the plaintiff, the court is not surprised that the plaintiff's efforts to retrieve the documents were minimal. Thus, in view of the substance of the disclosures, and the limited precautions taken by Koch to protect the documents from disclosure and then to retrieve the documents, the court finds that the interests of justice are best served by finding that Koch has waived its privilege with respect to the documents Bates stamp numbers 1489, 3414, and 3760. *See Ciba–Geigy,* 916 F.Supp. at 414.

There remains the question of a re-deposition of Mr. Hull. The court shall direct counsel for both parties to meet and discuss whether a second deposition is necessary, given the court's holding. If the defendant feels that it requires additional information of Mr. Hull about the substance of the documents, Koch shall accommodate a second deposition. No fees shall shift in the taking of the deposition. And, any second deposition shall be limited to four hours. Finally, the court shall discuss in more detail below the issue of subject matter waiver, which shall apply equally to any redeposition of Mr. Hull.

### d. Inadvertent Waiver and Subject Matter Waiver

██ The defendant argues that it is entitled to production of all documents within the same subject matter of those for which this court has found waiver of the attorney-client privilege, i.e. the Hull documents. The court shall review this request in light of the precept that the attorney-client privilege must be strictly construed to avoid obfuscation of the truth-finding process central to our system of justice. *See In re Grand Jury Investigation,* 599 F.2d at 1245.

In situations of inadvertent disclosure, both courts and authorities differ in their interpretation of the scope of the waiver. Wigmore espouses a general rule that waiver of the privilege with regard to some communications waives the privilege as to all other communications relating to the same subject matter. *See* 8 Wigmore, Evidence § 2328, 638 (McNaughton rev.1961). Wigmore's approach is based on the principle of fairness, that a litigant may not selectively disclose documents which may manipulate the truth: "the privilege of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former." *Id.* Wigmore's comment, however, refers specifically to the *client's* offer of a communication. Thus, the cases relying on Wigmore's position typically find that the client has affirmatively used the disclosed information to its advantage. *See, e.g., In re Leslie Fay Cos. Sec. Litig.,* 161 F.R.D. 274, 282 (S.D.N.Y.1995) ("Based principally on notions of fairness, courts have imposed such a 'subject matter waiver' most often when the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or when the party attacking the privilege will be prejudiced at trial."). Conversely, the position espoused in Wright, Miller, and Marcus more fully addresses the inadvertent disclosure circumstance, and asserts that "even where waiver is found justified . . . it is ordinarily limited to the materials actually disclosed." Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2016.2, 245–46 (1994). Courts following this approach focus on the inadvertent nature of the disclosure, which recognition alters the fairness determination. *See Fidelity,* 168 F.R.D. 516, 521, n. 7 ("Inadvertent disclosures of privileged communications do not waive the privilege as to the entire subject matter of those communications, . . . but only in very limited circumstances as to the particular documents disclosed.").

In the situation involving an inadvertent disclosure by counsel in discovery, the use to which the disclosing party puts the documents takes on increased importance. Courts balance the client's expectation of confidentiality with counsel's and/or the client's subsequent use of the documents to gauge the equitable scope of the waiver. "The general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications is not appropriate in the case of inadvertent disclosure, unless it is obvious that a party is attempting to gain an advantage or make offensive or unfair use of the disclosure." *Parkway Gallery Furniture v. Kittinger/Pennsylvania House Group,* 116 F.R.D. 46, 52 (M.D.N.C.1987). *See also First Wisconsin Mortg. v. First Wisconsin Corp.,* 86 F.R.D. 160, 173–74 (E.D.Wis.1980).

Here the defendant argues that the Hull documents suggest that the plaintiff has been withholding information favorable to the defendant's position. Specifically, the defendant asserts that the Hull documents tend to suggest that Shore Slurry did not receive the best price for comparable products from Koch, as the relevant contracts require. (*See* D's Brief at 13). The defendant further maintains that the plaintiff has attempted to use some of the information to its advantage. First, to this court's knowledge, the plaintiff has not attempted to use any of the Hull documents in this litigation. The defendant points to the plaintiff's use of the redacted e-mails, but this reference does not go beyond the redacted portions of the e-mail. Thus, at this point the court cannot find that the defendant has attempted to utilize the Hull documents to its advantage.

Second, as far as the perceived contradictory information revealed by the Hull documents, this is a factual issue, not an issue that is subject to the attorney-client privilege. To the extent that Koch has information related to the Robinson–Patman Act claim of price discrimination and the timing of its knowledge vis-a-vis any such claim, such information should be disclosed. Disclosure of such relevant information does not necessarily require the divulgence of privileged material. Nevertheless, it is clear to the court that the defendant has no faith in the forthrightness of the plaintiff. The defendant has asked either that the information be produced to the defendant or that it be reviewed by this court *in camera.* To ensure that all relevant information is pro-

duced, the court shall conduct an *in camera* review of the documents identified by the defendant in the privilege log, as well as the redacted portions of the e-mails for relevance. The court shall then determine whether relevant and not privileged information has been withheld.

Finally, the court shall require the plaintiff to review its files for any information relevant to the sales pricing of products relevant to this instant litigation: that is, information on all customers sold products of the same specification as those sold to Shore Slurry, including the E.J. Breneman E18-R product. All such information shall be produced to the defendant. Any confidentiality concerns have been met by the confidentiality order currently in place, as revised at the last conference on April 5, 2002. This shall also include all raw data used by Mr. Hull when forming a legal opinion in the pricing investigation.

The court finds that a full subject matter waiver of the attorney-client privilege is not warranted at this point. *Parkway Gallery Furniture,* 116 F.R.D. at 52.

### 2. *Work Product Doctrine*

The defendant's final request is for attachments to certain e-mails relating to the pricing discrimination claim. The attachments are pricing spreadsheets documenting products to customers presumably relevant to the defendant's 1999/2000 price discrimination claim. The defendant asserts that the information is relevant to its Robinson–Patman Act claim. The plaintiff maintains that the information is protected by the work product doctrine as it was produced at the behest of in-house counsel Robert Hull in his legal investigation of Shore Slurry's price discrimination claim.

The work product doctrine provides an independent ground upon which litigants may rely for protection of attorney materials prepared for trial. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The purposes behind the work product doctrine differ from those underlying the attorney-client privilege. The attorney-client privilege protects communications between clients and their attorneys, thus encouraging an open dialogue. *See Harding v. Dana Transport, Inc.,* 914 F.Supp. at 1097. In contrast, the work product doctrine maintains legal professionalism by precluding attorneys from capitalizing on an adversary's work efforts. *Hickman,* 329 U.S. at 511, 67 S.Ct. at 393–94; *see also In re Grand Jury (Impounded),* 138 F.3d 978, 981 (3d Cir. 1998). This doctrine has been codified as to tangible items in Rule 26(b)(3), Fed.R.Civ.P.[2] *Id.* The rule is aimed at protecting the legal theories developed by counsel in preparation for litigation. *Id.*

■ The work product doctrine, however, is not absolute: a party may waive attorney work product protection by selective disclosure of protected materials. *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1428 (3d Cir.1991). "A disclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance. Because the work-product doctrine serves instead to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not necessarily waive the protection of the work-product doctrine." *Id.*

■ The court need not reach the issue of whether the documentary attachments themselves are protected. This is because although the work product doctrine protects

**2.** Fed.R.Civ.P. 26(b)(3) states in pertinent part:

A party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

against the disclosure of protected documents or communications, it does not protect the underlying facts. *See Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Consequently, it does not contravene the work product rule for an attorney to question an opposing party as to the information contained in protected documents. *See Jaroslawicz v. Engelhard Corp.,* 115 F.R.D. 515, 518 (D.N.J.1987). In other words, where an attorney is "incisive enough to recognize and question" an opposing party on facts contained in protected documents, "[t]he fear that [opposing counsel's] work product would be revealed would thus become groundless." *Sporck v. Peil,* 759 F.2d 312, 318 (3d Cir. 1985). In the instant case, the defendant does not necessarily seek the actual spreadsheets attached to the e-mails. Rather, the defendant seeks information relevant to its claim of price discrimination under the Robinson–Patman Act. The plaintiff may choose in what form it produces relevant factual information. But, it cannot withhold relevant information on the basis of attorney work product.

Unfortunately, again, the defendant doubts the veracity of the plaintiff, and seeks judicial review of the information spreadsheets for relevant information. The court finds that such a review is not necessary. The information will most likely be found relevant. It is the content and format of the document about which the plaintiff claims protection. Thus, the court shall order the plaintiff to produce *all* information relevant to the defendant's price discrimination claim, including all records of both invoice and actual price for products at issue in the case for all customers within the relevant geographical area during the relevant time period. The plaintiff may produce that information in any form they wish which is responsive and comprehensible.

### B. *Koch[ ]s Cross Motion for the Return of Mr. Hull[ ]s Three Documents*

The plaintiff's cross motion for the return of documents 1489, 3414, and 3760 is denied in accordance with the above.

### D. *Non Party E.J. Breneman's Motion to Quash Subpoena*

Non party E.J. Breneman has moved to quash a subpoena duces tecum served upon it by the plaintiff seeking pricing and sales information of certain Koch products. The parties notified this court at oral argument on April 5, 2002, that they amicably resolved the motion through an amendment to the confidentiality order in this case. The court approved the amendment at oral argument, and this motion is consequently moot.

### C. *Non Party E.J. Breneman's Motion for Pro Hac Vice Admission*

Non party E.J. Breneman applied for the admission of John J. Speicher, Esquire and Kevin A. Moore, Esquire. L. Civ. R. 101.1 confers broad discretion to a court in admission of pro hac vice counsel. The rule provides that "[a]ny member in good standing of the bar of any court of the United States or of the highest court of any state, who is not under suspension or disbarment by any court and is ineligible for admission to the bar of this Court under L. Civ. R. 101.1(b), may in the discretion of the Court, on motion, be permitted to appear and participate in a particular case." L. Civ. R. 101.1(c).

No objections were raised at oral argument on April 5, 2002 to this application. Consequently, in accordance with the below order, the court shall grant E.J. Breneman's motion; and for good cause shown

IT IS on this 1st day of May, 2002 hereby

***ORDERED*** that the defendant's motion to compel, pursuant to Fed.R.Civ.P. 37 and 26, (Doc. No. 64–1) shall be ***granted in part and denied in part;*** to wit:

1. Defendant shall retain documents Bates stamped KMC 1489, 3414, and 3760, as the court holds that the attorney client privilege has been waived as to these documents;

2. Plaintiff shall produce for an *in camera* review, ***no later than May 15, 2002,*** the highlighted documents identified by the defendant in the privilege log given to this court at oral argument, a copy of which was given to the plaintiff;

3. Plaintiff shall produce for an *in camera* review, **no later than May 15, 2002,** documents Bates stamped KMC 8283, 8267, and 8268;

4. Plaintiff shall produce to the defendant, **no later than May 22, 2002,** *all* information relevant to the defendant's price discrimination claim, including all records of both invoice and actual price for products at issue in the case for all customers within the relevant geographical area during the relevant time period;

5. The parties shall determine whether they require a redeposition of Robert Hull, Esquire, in light of the instant order, which decision the parties may defer until fifteen business days following this court's decision on the *in camera* review; and any redeposition shall be limited to four (4) hours; and

IT IS FURTHER *ORDERED* that the plaintiff's cross-motion for a protective order requiring the return of documents Bates stamped KMC 1489, 3414, and 3760, pursuant to Fed.R.Civ.P. 26, (Doc. No. 68–1) shall be *denied;* and

IT IS FURTHER *ORDERED* that E.J. Breneman's motion to quash subpoena (Doc. No. 87–1) pursuant to Fed.R.Civ.P. 45 shall be *dismissed as moot;* and

IT IS FURTHER *ORDERED* that E.J. Breneman's motion for the admission *pro hac vice* of Kevin A. Moore, Esquire and John J. Speicher, Esquire, (Doc. No. 86–1) pursuant to L. Civ. R. 101.1(c) shall be *granted;* and Kevin A. Moore, Esquire, a member of the bar of the Commonwealth of Pennsylvania, and John J. Speicher, Esquire, a member of the bar of the Commonwealth of Pennsylvania, be permitted to appear *pro hac vice* in the above captioned matter pursuant to Local Rule 101.1(c), United States District Court for the District of New Jersey; provided, however, that all pleadings, briefs and other papers filed with the court shall be signed by Shawn J. Lau, Esquire, a member in good standing of the Bar of the Supreme Court of New Jersey and the Bar of this Court, who shall be held responsible for said papers and for the conduct of the case and who shall be present before the court during all phases of this proceeding, unless expressly excused by the court, as well as be held responsible for the conduct of the attorney admitted *pro hac vice* pursuant to this order; and

IT IS FURTHER *ORDERED* that Kevin A. Moore, Esquire and John J. Speicher, Esquire, shall pay the annual fee to the New Jersey Lawyer's Fund for Client Protection in accordance with New Jersey Court Rule 1:28–2 within twenty (20) days from the date of the entry of this order; and

IT IS FURTHER *ORDERED* that Kevin A. Moore, Esquire and John J. Speicher, Esquire, shall be bound by the General and Admiralty Rules of the United States District Court for the District of New Jersey, including but not limited to the provisions of Local Rule 103.1, *Judicial Ethics and Professional Responsibility,* and Local Rule 104.1, *Discipline of Attorneys;* and

IT IS FURTHER *ORDERED* that Kevin A. Moore, Esquire and John J. Speicher, Esquire, shall be deemed to have agreed to take no fee in any tort case in excess of the New Jersey Court Contingency Fee Rule, Rule 1:27–7, as amended.