Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC, 2018 NCBC 115.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

TECHNETICS GROUP DAYTONA,
INC.,

             Plaintiff,

v.

N2 BIOMEDICAL, LLC,

             Defendant.

N2 BIOMEDICAL, LLC,

      Counterclaim Plaintiff,

v.

TECHNETICS GROUP DAYTONA,
INC., and
TECHNETICS GROUP, LLC,

      Counterclaim Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 22738

**ORDER AND OPINION
ON MOTION TO COMPEL**

1.     Plaintiff Technetics Group Daytona, Inc. ("Technetics") has moved to compel the production of two sets of documents that Defendant N2 Biomedical, LLC ("N2") is withholding on the basis of attorney-client privilege. (ECF No. 126.) For the following reasons, the Court **GRANTS** in part and **DENIES** in part the motion.

*Robinson, Bradshaw & Hinson, P.A., by David C. Wright, III, Richard C. Worf, and Mark A. Hiller, and Perkins Coie LLP, by Kourtney Mueller Merrill, for Plaintiff/Counterclaim Defendant Technetics Group Daytona, Inc. and Counterclaim Defendant Technetics Group, LLC.*

*Brooks, Pierce, McClendon, Humphrey & Leonard, L.L.P., by David W. Sar and Jessica Thaller-Moran, and Greenberg Traurig, LLP, by David G. Thomas, and Peter Alley, for Defendant/Counterclaim Plaintiff N2 Biomedical, LLC.*

Conrad, Judge.

## I.
## BACKGROUND

2.      This case arises out of a dispute over the ownership of certain intellectual property.  In early 2017, Technetics and N2 entered into a Confidential Development Agreement ("CDA") for the purpose of developing semiconductor-related technology. (*See* Compl. ¶¶ 17–20, 29–30, ECF No. 3.)  The parties' work resulted in what they believe to be patentable technology (though the parties dispute who deserves the credit), and N2 filed a patent application, which the parties refer to as the '811 application.  (*See* Compl. ¶¶ 48, 52; Def.'s Second Am. Countercl. ¶¶ 1, 3, ECF No. 118.)  Technetics now contends, and N2 disputes, that the CDA requires N2 to assign the '811 application to Technetics.

3.      Discovery is well under way.  The parties have sought information about the negotiations that led to the CDA and about the development of the technology underlying the '811 application.  As relevant here, N2 has asserted the attorney-client privilege as a reason to withhold documents relating to both subjects.

4.      These documents include a number of communications exchanged among N2, its patent counsel, and Daniel Storey, a technology consultant.  N2 engaged Storey in April 2017 because of his expertise in relevant fields.  (*See* Tobin Aff. ¶ 7, ECF No. 141.)  Storey discussed ideas with N2 and its patent counsel, but those ideas were not included as part of the invention ultimately claimed in the '811 application. (Tobin Aff. ¶ 8.)  N2 disclosed twelve communications involving Storey in its privilege

log, asserting that they are protected by the attorney-client privilege and the common-interest doctrine. (*See* Def.'s Ex. B, ECF No. 142.)

5.      A second set of disputed documents relates to the CDA. N2 retained Paul Schor as outside corporate counsel to represent it during the negotiations over the agreement. (Tobin Aff. ¶ 2.) In August 2016, Schor revised a draft of the CDA and e-mailed his revisions to two N2 employees, Nader Kalkhoran and Eric Tobin. (*See* Tobin Aff. ¶ 3.) Kalkhoran then forwarded the revised document—including Schor's redlined edits and comments—to his counterpart at Technetics. (Pl.'s Exs. F, G, ECF Nos. 127.7, 127.8; Tobin Aff. ¶ 3.) N2 acknowledges that the revised draft and related e-mails are not privileged, and it has produced them. (Pl.'s Mem. in Supp. 9, ECF No. 127 ["Pl.'s Mem."].) It continues to assert its privilege, though, as to twenty-five other documents relating to the negotiation of the CDA. (*See* Def.'s Ex. B.)

6.      Upon receiving N2's privilege log, Technetics demanded that N2 produce all of these communications. When N2 refused, Technetics submitted the discovery dispute via e-mail (as required by Business Court Rule 10.9) and then, with the Court's permission, moved to compel production of the documents. (ECF No. 124.) Each side filed a brief and supporting materials, and the Court held a telephonic hearing on September 19, 2018. Following the hearing, the Court requested supplemental briefing to address the competency of portions of Eric Tobin's affidavit, which N2 filed in opposition to the motion to compel. (ECF Nos. 179, 182.) The parties filed those briefs on October 10, 2018. (ECF Nos. 183, 186.) On the same day, N2 also submitted an additional supporting affidavit from Nader Kalkhoran, which

Technetics then moved to strike. (*See* ECF Nos. 186.1, 187, 188, 191.) Briefing is now complete.

## II.
## ANALYSIS

7.  "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Dickson v. Rucho*, 366 N.C. 332, 340, 737 S.E.2d 362, 368 (2013) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

8.  Though justly revered, the attorney-client privilege carries a cost, having the effect of withholding potentially relevant and material evidence from the factfinder. *See, e.g.*, *In re Investigation of the Death of Miller*, 357 N.C. 316, 329, 584 S.E.2d 772, 782 (2003). If the privilege is applied too generously, that cost goes up and could exceed tolerable limits. Thus, courts must construe the privilege strictly and confine it to its intended purpose. *See Evans v. United Servs. Auto Ass'n*, 142 N.C. App. 18, 31, 541 S.E.2d 782, 790 (2001). And the party asserting the privilege (here, N2) bears the burden of proving its right to withhold documents from discovery. *See id.* at 32, 541 S.E.2d at 791.

9.  Before turning to the merits, one further observation deserves mention. Although the parties agree that North Carolina law governs, their dispute raises a number of legal issues that our appellate courts have not yet addressed. *See Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988) ("[R]emedial

or procedural rights are determined by lex fori, the law of the forum."). To support their positions, the parties draw heavily on the case law of other jurisdictions, especially federal courts. The Court explores this case law, and its relationship to North Carolina law, in more depth below.

A. N2's Communications with Daniel Storey

10. N2 seeks to protect several communications between its employees, its patent counsel, and Daniel Storey. The parties seem to agree that the attorney-client privilege ordinarily protects communications between a client and its patent counsel regarding the drafting of a patent application. *See In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1391 (Fed. Cir. 1996). The question is whether N2 waived its privilege by including Storey, an outside technical consultant, in the communications.

11. Technetics says yes. (*See* Pl.'s Mem. 3.) The general rule is that, when an attorney and client communicate in the presence of a third party, the communications are not privileged because they "are not confidential and because that person's presence constitutes a waiver." *Berens v. Berens*, 247 N.C. App. 12, 20, 785 S.E.2d 733, 740 (2016). According to Technetics, even if N2's communications with patent counsel would normally be privileged, the privilege was lost when N2 brought Storey into the conversation.

12. N2 relies on three exceptions to this general rule. First, it contends that Storey is the functional equivalent of an N2 employee and, as a result, isn't really a third party. (*See* Def.'s Mem. in Opp'n 6–7, ECF No. 140 ["Opp'n"].) Second, N2 invokes the *Kovel* doctrine, which holds that communications made in the presence

of a third party do not destroy the privilege if the third party is necessary for effective consultation between the attorney and client. (*See* Opp'n 7–9.) Third, N2 contends that the communications are protected by the common-interest doctrine. (*See* Opp'n 9–12.) The Court considers each in turn.

1. Functional Equivalence

13.     Although it is generally accepted that corporations may assert the attorney-client privilege, applying the privilege in the corporate context "presents special problems." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). As an artificial entity, a corporation can act only through its agents. *See, e.g.*, *Woodson v. Rowland*, 329 N.C. 330, 344, 407 S.E.2d 222, 231 (1991). Thus, when a corporation seeks legal advice, it must speak to its lawyers through individuals acting on the corporation's behalf. Given the variety of corporate roles and responsibilities, it is often a challenging task to decide who speaks for a corporation and whether that person's communications with corporate counsel are subject to the privilege.

14.     The law in this State is particularly unsettled. Our "appellate courts have not yet decided what test should apply as to the corporate attorney-client privilege." *Brown v. Am. Partners Fed. Credit Union*, 183 N.C. App. 529, 536, 645 S.E.2d 117, 123 (2007). Few North Carolina cases address, for example, whether and to what extent the privilege covers communications between counsel and lower-level employees (as opposed to covering only communications with senior management). *See Morris v. Scenera Research, LLC*, 2011 NCBC LEXIS 34, at *16–17 (N.C. Super.

Ct. Aug. 26, 2011). Fewer still address whether the privilege applies when communications involve an independent contractor, such as Storey.

15. As a result, N2 relies on federal case law defining the scope of the corporate attorney-client privilege. The United States Supreme Court has long held that the privilege is not limited to senior management. *See Upjohn*, 449 U.S. at 390–92. As the Court explained, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390. In some circumstances, lower-level employees may be the best or only source of information that would be useful to a lawyer. By the same token, the personnel tasked with implementing the lawyer's advice are often on the factory floor, not in the C-Suite. To permit corporate counsel to do their jobs efficiently and effectively, the privilege must be broad enough to cover communications with both upper management and employees farther down the organizational chart.

16. Some lower federal courts have extended this rationale to nonemployees so long as they perform roles that are functionally equivalent to employees. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010); *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994). Take accountants, for example. Even when working as an independent contractor, an accountant who performs regular accounting services for a corporation is highly likely to have "an insider's knowledge of the corporation's operations that few people even on the corporation's payroll have." *Bieter*, 16 F.3d at 937 (citation and quotation marks omitted). Some courts would treat the accountant

as functionally equivalent to an employee for the purpose of applying the attorney-client privilege. *See id.*; *but see BSP Software, LLC v. Motio, Inc.*, 2013 U.S. Dist. LEXIS 95511, at *6–9 (N.D. Ill. July 9, 2013) (criticizing the functional-equivalence test).

17.    N2 argues that the Court should apply this test here and conclude that Storey, though an independent contractor, is "a *de facto* N2 employee." (Opp'n 6.) But the standard for functional equivalence is exacting:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.,* 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (internal citations omitted). Even assuming North Carolina would adopt this test (which is far from certain), the burden is on N2 to show that Storey performed this type of role. It hasn't done so.

18.    Nothing in the record suggests that Storey held primary responsibility for any task within N2 or that he had a continuous and close working relationship with the company. By N2's own account, Storey is a technical consultant who is retained on a project-by-project basis and paid by the hour. (*See* Tobin Aff. ¶ 6.) He does not maintain an office at N2 or spend a substantial amount of his time working for N2. (*See* Tobin Aff. ¶ 6.) Nor is there evidence that others view Storey as a representative or employee of N2. *See, e.g., Lynx Sys. Developers, Inc. v. Zebra Enter. Sols. Corp.,* 2018 U.S. Dist. LEXIS 52628, at *11 (D. Mass. Mar. 28, 2018) (denying privilege as

to communications with third-party consultant); *Steinfeld v. IMS Health Inc.*, 2011 U.S. Dist. LEXIS 142288, at *9–11 (S.D.N.Y. Dec. 9, 2011) (same).

19. Storey's involvement with the '811 application was also limited. Although N2's description of Storey's work is somewhat unclear, it appears to have involved technical advice to help N2 invent a patentable solution and to decide whether that technology "could be commercially applied." (Tobin Aff. ¶ 7.) Storey's suggestions were not included in the '811 application, though, and his invoice to N2 reports that he worked a small number of hours. (Tobin Aff. ¶ 8; Tobin Aff. Ex. D, ECF No. 146.) At most, the evidence tends to show that Storey's role was "akin to that of an ordinary third-party specialist, disclosure to whom destroys the attorney-client privilege." *MLC Auto., LLC v. Town of S. Pines,* 2007 U.S. Dist. LEXIS 2841, at *11 (M.D.N.C. Jan. 11, 2007).

20. In short, N2 has not shown that Storey was a *de facto* employee. Assuming without deciding that North Carolina would apply the functional-equivalence test, N2 may not assert the attorney-client privilege on that basis.

2. *Kovel* Doctrine

21. N2 relies on a second federal rule—the *Kovel* doctrine. This doctrine, derived from a Second Circuit decision, holds that the attorney-client privilege is not destroyed by the presence of a third party if the third party "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

22.     It is a doctrine that has been widely embraced—and carefully limited. *Kovel* itself cautioned that clients seek input from consultants and other providers of professional services for all manner of reasons unrelated to facilitating legal advice. *See id.* Those communications do not become privileged solely because they are made to or in the presence of a lawyer. "[W]hen a client's ultimate goal is not legal advice, but is rather accounting, medical, or environmental advice, the privilege is inapplicable." *In re Grand Jury Matter*, 147 F.R.D. 82, 85 (E.D. Pa. 1992); *see also, e.g.*, *United States v. Richey*, 632 F.3d 559, 566 n.3 (9th Cir. 2011); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514–15 (D.C. Cir. 1993).

23.     Even when the client's ultimate goal is legal advice, the privilege does not extend to consultation with a third party that is merely useful or convenient. The third party's involvement "must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Cavallero v. United States*, 284 F.3d 236, 249 (1st Cir. 2002). Put another way, the third party must function more or less as a "translator or interpreter" between the client and the lawyer. *United States v. Ackert*, 169 F.3d 136, 139–40 (2d Cir. 1999); *see also UPMC v. CBIZ, Inc.*, 2018 U.S. Dist. LEXIS 52810, at *21–23 (W.D. Pa. Mar. 29, 2018); *Durling v. Papa John's Int'l, Inc.*, 2018 U.S. Dist. LEXIS 11584, at *14 (S.D.N.Y. Jan. 24, 2018); *Lynx*, 2018 U.S. Dist. LEXIS 52628, at *9–10; *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 146–47 (S.D.N.Y. 2016); *Cohen v. Trump*, 2015 U.S. Dist. LEXIS 74542, at *37–38 (S.D. Cal. June 9, 2015).

24.     For N2, this is a tall order. In his affidavit, Tobin states that "Storey was being consulted to help maximize N2's success as to the given task of *finding a workaround and inventing a patentable solution*." (Tobin Aff. ¶ 8 (emphasis added).) In other words, the reason N2 engaged Storey was that he had relevant technical expertise that N2 lacked. (*See* Tobin Aff. ¶¶ 6, 7.) This evidence strongly suggests that Storey "was retained for the value of his own advice, not to assist [N2's] attorneys in providing their legal advice." *Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999); *see also In re Grand Jury Matter*, 147 F.R.D. at 85.

25.     At no point does N2 argue that Storey's services were necessary to facilitate communication with its attorneys, nor does its evidence suggest that was the case. Tobin describes Storey's involvement as merely "helpful," not indispensable. (Tobin Aff. ¶ 7.) Storey devoted little time to the project, spoke with patent counsel once, and sent and received a handful of e-mails. (*See* Pl.'s Ex. A, ECF No. 127.2.) Storey's input may have been useful to N2 and its counsel, but there is no evidence that he played the role of an interpreter, which is what *Kovel* requires. *See, e.g.*, *Cavallero*, 284 F.3d at 247–48.

26.     Neither side cites any North Carolina case adopting or applying the *Kovel* doctrine. Assuming, though, that the doctrine applies here, N2 has not carried its burden and may not rely on *Kovel* to protect communications with Storey.

3. Common-Interest Doctrine

27.     As a final argument, N2 relies on the common-interest doctrine, which "extends the protection of the attorney-client privilege only to communications

between parties sharing a common interest about a legal matter." *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2013 NCBC LEXIS 38, at *17 (N.C. Super. Ct. Aug. 13, 2013). This doctrine is a poor fit here for at least two reasons.

28. First, the purpose of the common-interest doctrine is to enable parties to share information freely when they are represented by the same counsel or when they are represented by different counsel in a common legal endeavor (such as a litigation joint-defense group). *See, e.g., Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl., Inc.,* 247 N.C. App. 641, 647–49, 788 S.E.2d 170, 176–77 (2016); *Morris,* 2011 NCBC LEXIS 34, at *20. An essential element is that the parties must "agree to exchange information for the purpose of facilitating *legal representation of the parties.*" *Friday Invs.,* 247 N.C. App. at 648, 788 S.E.2d at 177 (emphasis added); *see also AP Atl., Inc. v. Crescent Univ. City Venture, LLC*, 2017 NCBC LEXIS 49, at *5 (N.C. Super. Ct. June 6, 2017).

29. N2 cannot satisfy this element. Although N2 was represented by counsel during the development of the '811 application, Storey was not. And N2's argument that Storey was a *de facto* employee of N2—and thus "for all intents and purposes" represented by N2's patent counsel, (Opp'n 11–12)—has already been rejected by the Court.

30. Second, our appellate courts have not "extended the common interest doctrine to relationships formed primarily for purposes other than indemnification or coordination in anticipated litigation." *Friday Invs.*, 247 N.C. App. at 651, 788 S.E.2d at 178. N2 engaged Storey to help develop a solution to a technological problem and,

possibly, to assist with preparing a patent application. Given the narrow construction our appellate courts have given to the common-interest doctrine, the Court declines to extend it to the relationship between N2 and Storey.

31. The common-interest doctrine therefore does not protect N2's communications with Storey, and as discussed above, N2 has not established any other basis for withholding those communications. Accordingly, N2 must produce them.

## B. CDA Negotiations

32. Technetics also asks the Court to compel N2 to produce twenty-five documents relating to the parties' negotiation of the CDA. The basis for Technetics's motion is an e-mail that Kalkhoran, an N2 employee, sent to Technetics during the negotiations. Kalkhoran attached to that e-mail a draft of the CDA that included revisions and comments from N2's attorney, Paul Schor. Technetics argues that, by disclosing Schor's legal advice, N2 waived its privilege not only as to that communication but also as to the subject matter of the CDA negotiations.

33. N2 responds that no waiver occurred because Schor's revisions were intended to be seen by Technetics and therefore were not privileged in the first place. (*See* Opp'n 12–13.) In the alternative, assuming Schor's communication was privileged, N2 argues that any waiver should be limited to that communication and should not result in a broad subject matter waiver. (*See* Opp'n 13–14.) The Court agrees with this second argument and therefore does not address the first.[*]

_____

[*] At the hearing, Technetics objected that certain statements in Tobin's affidavit are not competent evidence, and the Court allowed supplemental briefs on this question. The

34.     Deciding whether a waiver of privilege as to one communication "also ends the privilege as to any related but not disclosed communications" is a difficult question that has often divided courts. *Teleglobe Commc'ns Corp. v. BCE, Inc.*, 493 F.3d 345, 361 (3d Cir. 2007). Neither side cited any North Carolina precedent on this question, and the Court again looks to federal law for guidance.

35.     Technetics argues for a bright-line rule: the intentional disclosure of a privileged communication waives the privilege as to what was disclosed and also as to the subject matter of the disclosure. (*See* Pl.'s Mem. 11.) This argument finds support in some federal cases. *See, e.g., Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998); *Anderson v. Dobson*, 2007 U.S. Dist. LEXIS 66103, at *19–20 (W.D.N.C. Mar. 22, 2007). It is based on the proposition, espoused by Dean Wigmore in his leading treatise, that a party should not be able to "selectively disclose documents" in a way that shades the truth. *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 120 (D.N.J. 2002) (citing 8 Wigmore, Evidence § 2328, 638 (McNaughton rev. 1961)).

36.     Few courts would question this rationale. It is patently unfair for a party to use the privilege as a sword and a shield in litigation, making selective disclosures for tactical gain. But most courts have resisted the bright-line rule that Technetics advocates. When a party waives the privilege inadvertently or does so in a way that

---

disputed statements relate only to N2's argument that Schor's communication was intended for Technetics. Because the Court does not reach that question, there is no need to address the competency of Tobin's affidavit. In addition, in reaching its decision, the Court does not rely on Kalkhoran's affidavit and therefore denies Technetics's motion to strike the affidavit as moot.

causes no prejudice to its opponent, the rationale for extending the waiver to all related subject matter loses its force. In those circumstances, a broad subject matter waiver would cure no harm. It would be punitive. For that reason, courts have refused to find a subject matter waiver "where the results are particularly harsh and do not address the problems the subject matter waiver rule was designed to protect." *Wunderlich-Malec Sys., Inc. v. Eisenmann Corp.*, 2006 U.S. Dist. LEXIS 84889, at *32 (N.D. Ill. Nov. 17, 2006).

37. The modern trend decidedly favors a balanced approach. The "touchstone is fairness," *Teleglobe Commc'ns*, 493 F.3d at 361, and "the heavy weight of current authority . . . comes down on the side of employing fairness considerations to decide the scope of waivers," *Wi-LAN, Inc. v. LG Elecs., Inc.*, 684 F.3d 1364, 1373 (Fed. Cir. 2012) (collecting cases). This is reflected in recent revisions to the Federal Rules of Evidence, which limit subject matter waiver "to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." Fed. R. Evid. 502(a) advisory committee's note; *see also* Roger P. Meyers, *An Analysis of Federal Rule of Evidence 502 and Its Early Application*, 55 Wayne L. Rev. 1441, 1455 (2009) ("[S]ubject-matter waiver should be applied for remedial rather than punitive purposes.").

38. Sometimes fairness considerations favor a broad disclosure of related subject matter. Selective waiver is a classic example (as Dean Wigmore observed). Parties should not be able to disclose favorable material while concealing damaging material as privileged. Nor is it fair for a party to put the privileged communication

into issue—such as through an advice of counsel defense—while relying on the privilege. In both cases, courts "broaden the waiver as necessary to eliminate the advantage." *Teleglobe Commc'ns*, 493 F.3d at 361. As a general rule, "when a party reveals part of a privileged communication to gain an advantage in litigation, the party waives the attorney-client privilege as to all other communications relating to the same subject matter." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982); *see also Morgan v. City of Rockville*, 2014 U.S. Dist. LEXIS 151828, at *12–13 (D. Md. Oct. 24, 2014).

39. On the other hand, "when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed." *Teleglobe Commc'ns*, 493 F.3d at 361. This is especially so in the case of an extrajudicial disclosure made outside the context of litigation. As the Second Circuit explained, "disclosures made in public rather than in court—even if selective—create no risk of legal prejudice until put at issue in the litigation by the privilege-holder." *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987). The prevailing rule is that "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter." *XYZ Corp. v. United States (In re Keeper of the Records)*, 348 F.3d 16, 24 (1st Cir. 2003); *see also Wi-LAN*, 684 F.3d at 1373; *In re von Bulow*, 828 F.2d at 102; *Sullivan v. Warminster Twp.*, 274 F.R.D. 147, 154 (E.D. Pa. 2011) ("Courts generally hold that disclosures that occur outside the context of a judicial proceeding

do not implicitly waive the privilege as to all communications on the same subject matter.").

40. Here, too, the Court perceives no risk of unfair prejudice. N2 disclosed Schor's communication to Technetics outside of litigation and in the context of the parties' contract negotiations. Technetics does not argue that N2 has used the disclosure to gain an unfair advantage in this litigation, and the Court is not aware of any such advantage. The Court concludes that imposing a broad subject matter waiver at this point would not be appropriate.

41. As a result, if Schor's revisions to the CDA were privileged, any waiver was limited to that communication, which N2 has already produced. N2 is not required to produce the other twenty-five documents relating to the subject matter of the negotiation of the CDA and its draft terms.

### III.
### CONCLUSION

42. For these reasons, the Court **GRANTS** the motion to compel as to N2's communications with Daniel Storey. The Court **ORDERS** that N2 shall produce these documents no later than seven days after the entry of this Order.

43. The Court **DENIES** the motion to compel as to N2's communications with counsel concerning the parties' negotiation of the Confidential Development Agreement.

44. The Court also **DENIES** Technetics's motion to strike the Affidavit of Nader Kalkhoran as **MOOT**.

45. Each side shall bear its own costs and fees.

This the 8th day of November, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases